MANNINGTON MILLS, INC., Appellant,

v.

CONGOLEUM CORPORATION,
Appellee.

No. 78–1845.

United States Court of Appeals,
Third Circuit.

Argued Jan. 15, 1979.
Decided April 3, 1979.

---

John N. Bain, Jeffrey L. Miller, Carella, Bain, Gilfillan & Rhodes, Newark, N. J., for appellant.

Frederick W. Rose, Young, Rose & Millspaugh, Newark, N. J., Michael M. Maney, Michael Winger, Robert M. Hayes, New York City, Sullivan & Cromwell, New York City, of counsel, Richard T. Laughlin, Kearney, N. J., for Appellee Congoleum Corp.

Before ADAMS and WEIS, Circuit Judges and WEINER,* District Judge.

* Honorable Charles R. Weiner, United States District Court for the Eastern District of Pennsylvania, sitting by designation.

OPINION OF THE COURT

WEIS, Circuit Judge.

Alleging that foreign patents were secured by fraud, which if perpetrated in securing a domestic patent would lead to antitrust liability, plaintiff seeks treble damages and injunctive relief. The district court dismissed the complaint, relying primarily upon the act of state doctrine. We conclude that in this instance that ground does not bar consideration of plaintiff's claim. Because we determine, however, that in deciding whether jurisdiction should be exercised the district court should weigh the enforcement of the antitrust laws against the interests of comity and international relations, we remand for the development of an adequate record.

Congoleum Corporation holds American patents for the manufacture of chemically embossed vinyl floor covering and owns corresponding patents in some 26 foreign countries. Mannington Mills, Inc., too, is in the business of manufacturing flooring and is licensed to use the Congoleum patents in this country. Although Mannington claimed to have similar rights under the foreign patents, that contention was decided adversely in companion litigation, *Mannington Mills, Inc. v. Congoleum Industries, Inc.*, 197 U.S.Pat.Q. 145 (D.N.J.1977), and Congoleum has instituted infringement suits against Mannington in New Zealand, Canada, Australia, and Japan.

In 1974, Mannington filed suit in the district court of New Jersey alleging, *inter alia*, that Congoleum's licensing practices in the overseas markets violated § 2 of the Sherman Antitrust Act, 15 U.S.C. § 2. Summary judgment on the antitrust claim was entered in favor of the defendant and the case is presently on appeal. Mannington had sought to amend its complaint in that suit by adding allegations of Congoleum's fraud in securing its foreign patents. The district court denied leave to amend the complaint as to this specific contention. Thereafter, Mannington filed the present action based on essentially the same grounds. The district court dismissed the complaint for failure to state a claim and

also declined to exercise jurisdiction in a pendent state unfair competition count.

Mannington's complaint alleges that Congoleum made fraudulent representations to various foreign patent offices in the following general categories:

1. False statements about the reactions and performance of some of the chemical components of the vinyl flooring;
2. Misrepresentation of test data;
3. Suppression of information critical to the practice of the invention;
4. Misleading statements about the status and contents of the United States patent applications.

The complaint charges that Congoleum enforced the foreign patents by bringing and threatening the institution of infringements suits in foreign countries. This activity allegedly restrained the export trade of the United States by restricting the foreign business of Mannington and other American competitors in addition to demonstrating an intent to monopolize. Mannington asserts further that Congoleum's false claims of priority dates were in violation of the Paris Convention of March 20, 1883, *as amended*, [1962] 13 U.S.T. 1, and the Pan-American Convention of August 20, 1910, 38 Stat. 1811.

The district court held that since no private right of action was set out in the treaties no relief could be granted. The antitrust count was dismissed on the grounds that the validity of the foreign patents was to be determined by the courts of the respective issuing nations and there was no necessity for American firms to apply for foreign patents in any way other than as established by the respective nations. The court stated that to enjoin Congoleum from enforcing its foreign patents in other nations against Mannington would violate the act of state doctrine.

Mannington emphasizes that it is not challenging the right of a foreign government to confer patents under its own requirements and indeed does not seek to have the patents at issue adjudged invalid.

Rather, its claims are said to arise out of breach of standards imposed by American law and thus are properly determinable in the district court. Mannington argues that use of the United States courts to resolve antitrust claims stemming from fraud in the procurement of patents abroad is consistent with the extraterritorial jurisdiction of the Sherman Act, and litigation in a single forum furthers judicial efficiency. Congoleum contends, however, that Mannington's theory for antitrust relief is barred by the act of state doctrine, and subjecting a putative patentee to United States standards for foreign patent procurement is an unwarranted extension of the antitrust laws.

## I

### JURISDICTION

We turn first to the question of jurisdiction. Both parties are subject to service of process in New Jersey and in personam jurisdiction is concededly present. What is at issue, however, is subject matter jurisdiction.

■ The challenge here is to conduct by an American corporation in a foreign country, arguably legal there, and the issue is whether that activity is answerable in the courts of the United States under the Sherman Act's broad and potentially far-reaching language. The extraterritorial application of the Act to "trade or commerce . . . with foreign nations" has been and continues to be the subject of lively controversy. *See, e.g.,* Kintner & Griffin, *Jurisdiction Over Foreign Commerce Under the Sherman Antitrust Act,* 18 B.C.Ind. & Com.L. Rev. 199 (1977). Neither the Act nor its legislative history gives any clear indication of the scope of the extraterritorial jurisdiction conferred, leaving such determination

to the courts. *Id.* at 200–19; *see* Ongman, *"Be No Longer a Chaos:" Constructing a Normative Theory of the Sherman Act's Extraterritorial Jurisdictional Scope,* 71 Nw. U.L. Rev. 733, 735–41 (1977).

Justice Holmes's opinion in *American Banana Co. v. United Fruit Co.,* 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826 (1909), cast doubt on the intent of Congress to extend the Sherman Act to action perpetrated beyond United States territory. Since then, however, the Supreme Court has made it clear that "foreign commerce" applies to importing, exporting, and other commercial transactions, as well as transportation and communication between the United States and a foreign country.[1] Acts and agreements occurring outside the territorial boundaries of the United States that adversely and materially affect American trade are not necessarily immune from United States antitrust laws. *Timken Roller Bearing Co. v. United States,* 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951); *United States v. National Lead Co.,* 332 U.S. 319, 67 S.Ct. 1634, 91 L.Ed. 2077 (1947); *United States v. Sisal Sales Corp.,* 274 U.S. 268, 47 S.Ct. 592, 71 L.Ed. 1042 (1927); *Thomsen v. Cayser,* 243 U.S. 66, 37 S.Ct. 353, 61 L.Ed. 597 (1917); *United States v. Pacific & Arctic Railway & Navigation Co.,* 228 U.S. 87, 33 S.Ct. 443, 57 L.Ed. 742 (1913).

In oft-quoted language, Judge Learned Hand in *United States v. Aluminum Co. of America (Alcoa),* 148 F.2d 416, 443–45 (2d Cir. 1945), concluded that although Congress did not intend the Sherman Act to prohibit conduct having no effect in the United States, it did intend the Act to reach conduct having consequences within this country—even where the parties concerned had no allegiance to the United States—if the conduct is intended to and actually does

---

1. For commentary on the implications and erosion of the *American Banana* view of jurisdiction, *see* Fortenberry, Jurisdiction Over Extraterritorial Antitrust Violations—Paths Through the Great Grimpen Mire, 32 Ohio St.L.J. 519, 523–31 (1971); Fugate, Antitrust Jurisdiction and Foreign Sovereignty, 49 Va.L.Rev. 925, 926–35 (1963); Kintner & Griffin, *supra* at 204–12; Raymond, The Exercise of Concurrent Jurisdiction: "Move with Circumspection Appropriate," 8 B.C.Ind. & Com.L.Rev. 673, 683–89 (1967); Note, Sherman Act Jurisdiction and the Acts of Foreign Sovereigns, 77 Colum.L.Rev. 1247, 1249–50 & n. 12 (1977); Comment, Extraterritorial Application of the Antitrust Laws: A Conflict of Laws Approach, 70 Yale L.J. 259, 260–64 (1960).

have an effect upon United States imports or exports. This wide-reaching "intended effects" test has been cited with approval by the Supreme Court. *See, e.g., Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 705, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962). *See also* Restatement (Second) of the Foreign Relations Law of the United States § 18 (1965).

 It can no longer be doubted that practices of an American citizen abroad having a substantial effect on American foreign commerce are subject to the Sherman Act. As was observed in *Steele v. Bulova Watch Co.,* 344 U.S. 280, 282, 73 S.Ct. 252, 254, 97 L.Ed. 252 (1952), a case involving trademark infringement under the Lanham Trade-Mark Act of 1946, 15 U.S.C. §§ 1051–1127, "Congress in prescribing standards of conduct for American citizens may project the impact of its laws beyond the territorial boundaries of the United States." This view has been criticized because its failure to abide by the basic tenet that a nation's legislation is valid only in the territory it governs leads to unnecessary international friction.[2] Nevertheless, when two American litigants are contesting alleged antitrust activity abroad that results in harm to the export business of one, a federal court does have subject matter jurisdiction. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). Therefore, we are satisfied that the district court did have jurisdiction in this case.

## II

### ACT OF STATE

 The defendant relies heavily upon the act of state doctrine but we conclude that it does not preclude adjudication of Mannington's claims. The doctrine is a policy of judicial abstention from inquiry into the validity of an act by a foreign government. The premise upon which it rests is that an act by the sovereign power of a

foreign state or by its authorized agent in its own territory and within the scope and authority of the office cannot be questioned or made the subject of legal proceedings in our courts. Similar to, and thought to be derived from the concept of sovereign immunity, the act of state doctrine has a distinguishing characteristic in that it can be invoked as a defense by a private litigant.

In one of the earliest expressions of this doctrine, Chief Justice Fuller in *Underhill v. Hernandez,* 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897) said:

> "Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory."

In later years, there was a shift in focus from the notions of sovereignty and the dignity of independent nations· recognized in *Underhill* and in *American Banana Co. v. United Fruit Co., supra,* to concerns for preserving the "basic relationships between branches of government in a system of separation of powers," and not hindering the executive's conduct of foreign policy by judicial review or oversight of foreign acts. *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 423, 84 S.Ct. 923, 938, 11 L.Ed.2d 804 (1964). Another more recent view is that the doctrine is based on notions of comity and a conflict of laws theory that foreign law is to be accepted as the rule of decision in passing upon acts occurring within the foreign power's jurisdiction. Note, *Sherman Act Jurisdiction and the Acts of Foreign Sovereigns,* 77 Colum.L. Rev. 1247, 1255 & n.36 (1977).

██ But whatever its theoretical foundation, by precluding inquiry into the validity of a foreign sovereign's act, the doctrine requires American courts to reject private claims based on the contention that the

---

2. *See* Fortenberry, Paths Through the Great Grimpen Mire, *supra* at 531–38; Raymond, "Move with Circumspection Appropriate," *supra* at 683–89; Note, Sherman Act Jurisdiction and the Acts of Foreign Sovereigns, *supra* at 1250 & nn.14–15; Comment, Extraterritorial Application of the Antitrust Laws: A Conflict of Laws Approach, *supra* at 259–64.

damaging act of another nation violates either American or international law.[3] That preclusion is not lightly to be imposed and to determine whether the act of state doctrine applies in a given factual context, the court must analyze the nature of the questioned conduct and the effect upon the parties in addition to appraising the sovereign's role. *See* Restatement (Second) of Foreign Relations Law, *supra* § 41, Comment d.

Cases involving confiscatory measures taken by foreign sovereigns provided the first opportunities to apply the doctrine and until recent years courts seldom referred to the subject in antitrust litigation. Timberg, *Sovereign Immunity and Act of State Defenses: Transnational Boycotts and Economic Coercion*, 55 Texas L.Rev. 1 (1976); *see also* Note, 69 Mich.L.Rev. 888 (1971). In the typical confiscation situation based on a foreign state's expropriation of property rights or its repudiation of contractual obligations, only private rights are sought to be vindicated. In antitrust litigation, however, in addition to claims of private injury, there is a public interest in clearing monopolistic activities from the channels of American commerce.

 Similar in effect but somewhat conceptually distinct is the defense of foreign compulsion which shields from antitrust liability the acts of parties carried out in obedience to the mandate of a foreign government. The sovereign compulsion defense is not principally concerned with the validity or legality of the foreign government's order, but rather with whether it compelled the American business to violate American antitrust law. Thus, in *Interamerican Refining Corp. v. Texas Maracaibo, Inc.*, 307 F.Supp. 1291 (D.Del.1970), the defendant was held not responsible for a boycott forced upon it by the Venezuelan government. *See* Michigan Note, *supra*; Note, *Export Policy, Antitrust and the Arab Boycott*, 51 N.Y.U.L.Rev. 94, 125–31 (1976). *See also* Fugate, *Antitrust Jurisdic-*

*tion and Sovereign Immunity*, 49 Va.L.Rev. 925, 934–37 (1963); Antitrust Division, U.S. Dept. of Justice, Antitrust Guide for International Operations (Jan. 26, 1977) (Antitrust Guide). One asserting the defense must establish that the foreign decree was basic and fundamental to the alleged antitrust behavior and more than merely peripheral to the overall illegal course of conduct. In *United States v. Sisal Sales Corp., supra*, for example, the Court concluded that Mexican legislation solicited by American banks to facilitate the establishment of a cartel that monopolized United States imports was not a sufficiently coercive act by a foreign government to justify the banks' Sherman Act violations. In that instance, foreign governmental activity was in reality involvement arranged by the defendants rather than independently conceived legislation directed toward an essential part of the violations.

 Where the governmental action rises no higher than mere approval, the compulsion defense will not be recognized. It is necessary that foreign law must have coerced the defendant into violating American antitrust law. *Continental Ore Co. v. Union Carbide & Carbon Corp., supra; Timberlane Lumber Co. v. Bank of America*, 549 F.2d 597 (9th Cir. 1976). The defense is not available if the defendant could have legally refused to accede to the foreign power's wishes, *United States v. Watchmakers of Switzerland Information Center, Inc.*, 1963 Trade Cases (CCH) ¶ 70,600 (S.D. N.Y.1962), *order modified*, 1965 Trade Cases (CCH) ¶ 71,352 (S.D.N.Y.1965). *See* W. Fugate, Foreign Commerce and the Antitrust Laws 75–82 (rev. ed. 1973).

 The defendant here contends that, whether valid or invalid, the grants of foreign patents could be accomplished only by affirmative governmental actions and therefore are acts of state which American courts are not free to examine. We are unable to accept the proposition that the mere issuance of patents by a foreign pow-

---

**3.** *See generally* Golbert & Bradford, The Act of State Doctrine: Dunhill and Other Sabbatino Progeny, 9 Sw.L.Rev. 1 (1977); Zander, The Act of State Doctrine, 53 Am.J.Int'l L. 826 (1959); Note, Sherman Act Jurisdiction and the Acts of Foreign Sovereigns, *supra*.

er constitutes either an act of state, as that term has developed under case law, or an example of governments' compulsion.

■ There is no allegation of collusion with foreign governments in securing the patents, nor was the defendant compelled to refuse a license to the plaintiff. *See, e. g., Continental Ore Co. v. Union Carbide & Carbon Corp., supra,* 370 U.S. at 706, 82 S.Ct. 1404; *Occidental Petroleum Corp. v. Buttes Gas & Oil Co.,* 331 F.Supp. 92 (C.D. Cal.1971), *aff'd per curiam,* 461 F.2d 1261 (9th Cir.), *cert. denied,* 409 U.S. 950, 93 S.Ct. 272, 34 L.Ed.2d 221 (1972). Thus, by issuance of the patents per se, the foreign governments did not force the defendant to exclude the plaintiff from the foreign markets and the defense of compulsion is not available.

The case *sub judice* also fails to fall within the more traditional applications of the act of state doctrine. The grant of a patent is quite different from an act of expropriation by a government. *See Banco Nacional de Cuba v. Sabbatino, supra; American Banana Co. v. United Fruit Co., supra; Hunt v. Mobil Oil Corp.,* 550 F.2d 68 (2d Cir.), *cert. denied,* 434 U.S. 984, 98 S.Ct. 608, 54 L.Ed.2d 477 (1977). In those instances, moreover, the crucial acts occurred as a result of a considered policy determination by a government to give effect to its political and public interests—matters that would have significant impact on American foreign relations. *See* Restatement (Second) of Foreign Relations Law, *supra* § 41. Those situations may be distinguished from the failure to pay an ordinary commercial debt, *Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 695–

97, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976) (plurality opinion) or the determination of a security interest in litigation between private parties in a foreign nation's court. *Timberlane Lumber Co. v. Bank of America, supra* at 605–08. In each of the foregoing instances, an act of state defense was denied.[4] *See also United States v. Imperial Chemical Industries, Ltd.,* 100 F.Supp. 504 (S.D.N.Y.1951) (patent rights).

■ The grant of patents for floor coverings is not the type of sovereign activity that would be of substantial concern to the executive branch in its conduct of international affairs. Although enforcement of a decree in the present litigation may possibly present problems of international relations, as will be discussed *infra,* the granting of the patents per se, in substance ministerial activity, is not the kind of governmental action contemplated by the act of state doctrine or its correlative, foreign compulsion. We conclude, therefore, that the asserted act of state defense does not support dismissal of plaintiff's complaint and it does not apply to the patents issued in the foreign countries.

## III

## COMITY, ABSTENTION AND INTERNATIONAL REPERCUSSIONS

Having concluded that the act of state doctrine is not applicable in these circumstances and that there is subject matter jurisdiction, the question remains whether jurisdiction should be exercised. *Cf. SEC v. Kasser,* 548 F.2d 109 (3d Cir.), *cert. denied,* 431 U.S. 938, 97 S.Ct. 2649, 53 L.Ed.2d 255

---

4. The Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1602–1611, distinguishes between public acts and commercial dealings of foreign nations and excludes the latter from the scope of sovereign immunity in American courts. *See also* Kintner & Griffin, *supra* at 237; Note, Sherman Act Jurisdiction and the Acts of Foreign Sovereigns, *supra* at 1253–58; Comment, Extraterritorial Application of the Antitrust Laws: A Conflict of Laws Approach, *supra* at 270–72. The legislation effectively narrows the scope of sovereign immunity, a step which was unable to command a majority of the court as to the act of state doctrine in

*Alfred Dunhill of London, Inc. v. Republic of Cuba, supra.* Congressional opposition to the *Sabbatino* opinion, however, led to the adoption of the Hickenlooper amendment to the Foreign Assistance Act of 1964, 22 U.S.C. § 2370(e)(2), which severely restricts application of the doctrine *inter alia* in the case of a foreign confiscation or taking after January 1, 1959 and in violation of the principles of international law, unless the President determines that the doctrine's application is required in a particular case and so indicates. *See* Golbert & Bradford, The Act of State Doctrine: Dunhill and Other Sabbatino Progeny, *supra* at 27–33.

(1977); *Straub v. Vaisman & Co.*, 540 F.2d 591 (3d Cir. 1976). *See also* Beausang, *The Extraterritorial Jurisdiction of the Sherman Act*, 70 Dick.L.Rev. 187 (1966); Ongman, *"Be No Longer A Chaos," supra.*

Some analysis of the plaintiff's position is helpful in identifying the considerations bearing on this issue. Essentially, the plaintiff seeks to extend the doctrine of *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965), a case alleging a domestic patent antitrust violation, to an international setting. In *Walker*, the Supreme Court held that a company which had engaged in monopolistic activity was subject to Sherman Act liability when the conduct had been carried on under the shield of a patent obtained from the United States Patent Office by intentional fraud. The Court observed that a patent provides an exception to the general rule against monopolies but proof of knowing and wilful misrepresentation of facts to the patent office strips the patentee of its exemption. In that event, if the plaintiff can prove the other elements of a Sherman Act § 2 violation in addition to invalidity of the patent, then it is entitled to recover treble damages.

Mannington seeks to apply the same rationale here, although it is not attacking Congoleum's American patents but only its corresponding ones abroad. Mannington asserts that it need not prove the invalidity of the foreign patents under the issuing countries' laws. It argues that they were obtained by conduct considered fraudulent under American law and would expose Congoleum to antitrust liability in this country if domestic patents were at issue. There-

fore, says Mannington, it is not necessary to examine the patent law of 26 foreign countries to determine if the Congoleum patents are valid there.

*Walker*, of course, did not go so far. It held only that a patent invalid under American law because of fraud may expose the defendant to American antitrust penalties.[5] Mannington urges that a patent, even though valid under the law of a foreign nation, cannot act as an exemption for antitrust liability if procured by conduct unacceptable by American standards. Mannington would hold Congoleum liable for its activity abroad that impaired plaintiff's foreign business or barred it from competition in a nation altogether. In short, Mannington presses us to apply the same reach to the Sherman Act as did the Court to the Lanham Act in *Steele v. Bulova Watch Co., supra.* In that case, an American company sued an American citizen in a United States court alleging that the use of a trademark registered in Mexico and imprinted there on articles, some of which found their way to the United States, violated United States law. Before the case reached the Supreme Court, however, the Mexican government nullified its registration. As the Court acknowledged:

"[T]here is thus no conflict which might afford petitioner a pretext that such relief would impugn foreign law. The question, therefore, whether a valid foreign registration would affect either the power to enjoin or the propriety of its exercise is not before us. Where, as here, there can be no interference with the sovereignty of another nation, the District Court in exercising its equity powers may command persons properly before it

---

5. One commentator has suggested that a different approach may be appropriate in considering foreign statutes.

 "Prevention of fraudulent acquisition of patent rights may be more important under United States law than under foreign law, because once the right is established we generally do not police profits, and we generally do not require licensing . . . . Since we do neither of those things, and thus essentially allow a monopoly return to the inventor of a product of commercial significance, it be-

comes very important to determine whether the patent was valid in the first place. Because of this, we have additional engraftings on the element of validity. One enlargement . . . is the doctrine that fraudulently obtaining a patent is an antitrust violation—a monopolization or an attempt to monopolize." Davidow, United States Antitrust Laws and International Transfers of Technology—The Government View, 43 Fordham L. Rev. 733, 735 (1975).

to cease or perform acts outside its territorial jurisdiction." *Id.* at 289, 73 S.Ct. at 257.

If it be assumed that the foreign patents are invalid under the issuing countries' laws because of intentional fraud, then it would seem proper to extend *Walker* to cover the situation, at least in the absence of antitrust legislation in the foreign nation. But Mannington's position requires that we take as a premise that patents are enforceable in the foreign countries and that the fraud, perhaps because of irrelevance to foreign patent requirements or of inability to satisfy a "but for" test, *see e.g., Corning Glass Works v. Anchor Hocking Glass Corp.*, 253 F.Supp. 461 (D.Del.1966), *rev'd on other grounds*, 374 F.2d 473 (3d Cir.), *cert. denied*, 389 U.S. 826, 88 S.Ct. 65, 19 L.Ed.2d 80 (1967), is insufficient under foreign law to constitute grounds for invalidity.

In addition to treble damages, Mannington asks that Congoleum be enjoined from enforcing these hypothetically valid patents in the foreign jurisdictions. Obviously, some potential for conflict with the policy of foreign nations is present in both forms of relief.

A judgment against Congoleum in this country would have direct and ripple effects abroad. It is not unusual for other nations to condition the issuance of patents upon certain requirements, *e.g.*, that the article be manufactured in that country; that it be actively "worked"; or that licenses be restricted in various ways, or at the other extreme, be compulsory. It may be also that some nations might require that the patent be enforced. Nationals may be preferred over foreigners or patent laws may have been designed to develop the technical know-how of an underdeveloped country. *See* Wayman, *Patent Protection in International Business Transactions*, 45

Den. L.J. 64 (1968). Many of these policies could be frustrated by a decree of an American court which, in effect, declares the foreign patent invalid both by American standards and as it may affect American commerce.

This may, indeed, be a situation where the consequences to the American economy and policy permit no alternative to firm judicial action enforcing our antitrust laws abroad. But before that step is taken, there should be a weighing of competing interests.

■ The antitrust statutes enacted by Congress commit this country to the free enterprise system and the exercise of open competition. If an American company is excluded from competition in a foreign country by fraudulent conduct on the part of another American company, then our national interests are adversely affected. In a purely domestic situation, the right to a remedy would be clear. When foreign nations are involved, however, it is unwise to ignore the fact that foreign policy, reciprocity, comity, and limitations of judicial power are considerations that should have a bearing on the decision to exercise or decline jurisdiction.[6]

Some decisions of American courts have been criticized for failure to adequately assess these concerns. In *United States v. Imperial Chemical Industries, Ltd.*, 105 F.Supp. 215 (S.D.N.Y.1952), the court obtained personal jurisdiction over a British defendant, I.C.I., in an antitrust case. As part of the remedy, the court ordered I.C.I. to divest itself of certain patents which it had received from an American defendant, DuPont Company. However, I.C.I. was already under contract to grant exclusive licenses for these patents to another British company, British Nylon Spinners, Ltd., which was not before the American court.

---

**6.** The Antitrust Guide, *supra*, takes the position that:

"[C]onsiderations of jurisdiction, enforcement policy, and comity often, but not always, lead to the same conclusion: the United States antitrust laws should be applied to an overseas transaction when there is a substantial and foreseeable effect on the United States com-

merce; and, consistent with these ends, it should avoid unnecessary interference with the sovereign interests of foreign nations." Antitrust Guide, *supra* at 6–7, *quoted in* Fugate, The Department of Justice's Antitrust Guide for International Operations, 17 Va.J.Int'l L. 645, 653 (1977).

The contract being legal and enforceable in England, a court there prohibited I.C.I. from parting with the patents and required it to keep its agreement with British Nylon Spinners, Ltd. In the course of its opinion, the British court commented pointedly:

"Applied conversely, I conceive that the American courts would likewise be slow (to say the least) to recognise an assertion on the part of the British courts of jurisdiction extending, in effect, to the business affairs of persons and corporations in the United States." *British Nylon Spinners, Ltd. v. Imperial Chemical Industries, Ltd.*, [1953] 1 Ch. 19, 24 (C.A.), *made permanent*, [1955] 1 Ch. 37.

In other cases, orders by American courts directed to foreign countries to produce their records in this country have provoked protest and specific prohibitory legislation from those nations. *See In re Grand Jury Subpoena Duces Tecum Addressed to the Canadian International Paper Co.*, 72 F.Supp. 1013 (S.D.N.Y.1947); *Raymond, "Move with Circumspection Appropriate," supra; cf. Societe Internationale v. Rogers*, 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958); *Ohio v. Arthur Andersen & Co.*, 570 F.2d 1370 (10th Cir.), *cert. denied*, —— U.S. ——, 99 S.Ct. 114, 58 L.Ed.2d 129 (1978); Note, *Foreign Nondisclosure Laws and Domestic Discovery Orders in Antitrust Litigation*, 88 Yale L.J. 612 (1979).

The decision in *Zenith Radio Corp. v. Hazeltine Research, Inc., supra*, caused serious misgivings in Canada. *See* Comment, *American Antitrust Laws and Canadian Patent Rights*, 118 U.Pa.L.Rev. 983 (1970).

Some courts have exhibited a greater sensitivity to principles of international comity. For example, in *United States v. General Electric Co.*, 82 F.Supp. 753 (D.N.J.1949), *opinion on remedies*, 115 F.Supp. 835 (D.N.J.1953), then District Judge Forman inserted a savings clause in his order so as not to place the defendant in violation of laws in foreign countries where it carried on business. *Cf. Vanity Fair Mills, Inc. v. T. Eaton Co.*, 234 F.2d 633 (2d Cir.), *cert. denied*, 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956) (court interpreted *Steele v. Bulova Watch Co., supra*, as applying to conduct of its citizens in foreign countries when the rights of other nations or their nationals are not infringed).

In eschewing a provincial approach, these latter cases, in our view, best reflect the realities of international commerce. Courts should not shrink from their duty because of an inability by the affected parties to reach a consensus. Enough has been said, however, to demonstrate the appropriateness of a recent commentary made in another context: "Perhaps the one point that deserves to be stressed for the future is that the substantive antitrust analysis must not be applied mechanically where foreign contacts are involved—not even in the so called per se area. More subtlety is required . . . ." I P. Areeda & D. Turner, Antitrust Law § 240 at 278 (1978).

In *Timberlane Lumber Co. v. Bank of America, supra* at 614–15, the Court of Appeals for the Ninth Circuit adopted a balancing process in determining whether extraterritorial jurisdiction should be exercised, an approach with which we find ourselves in substantial agreement. The factors we believe should be considered include:

1. Degree of conflict with foreign law or policy;
2. Nationality of the parties;
3. Relative importance of the alleged violation of conduct here compared to that abroad;
4. Availability of a remedy abroad and the pendency of litigation there;
5. Existence of intent to harm or affect American commerce and its foreseeability;
6. Possible effect upon foreign relations if the court exercises jurisdiction and grants relief;[7]

---

7. We note the suggestion in the concurring opinion that problems regarding the formulation of relief can be dealt with at a subsequent stage of the litigation. That may be possible in some cases. Once th[...] opportunity to evalu[...] countervailing inter[...] record presented w[...]

7. If relief is granted, whether a party will be placed in the position of being forced to perform an act illegal in either country or be under conflicting requirements by both countries;

8. Whether the court can make its order effective;

9. Whether an order for relief would be acceptable in this country if made by the foreign nation under similar circumstances;

10. Whether a treaty with the affected nations has addressed the issue.

 The record in this case is not adequate to allow a reasoned decision on these highly complex issues even if only one foreign nation were involved rather than 26. Moreover, we do not believe that the extensive inquiry required must yield the same answer in each instance. The legislation and policy of each nation is not likely to be the same, nor is it probable that the effect upon commerce in each instance will be as substantial as others. Although the plaintiff would prefer to have the matter resolved as a unitary one, that cannot be done when the individual interests and policies of each of the foreign nations differ and must be balanced against our nation's legitimate interest in regulating anticompetitive activity.

We conclude, therefore, that it was error to dismiss the plaintiff's complaint without preparation of a record which will allow an evaluation of the factors counseling for or against the exercise of jurisdiction.

## IV

### TREATY COUNT

In the third count of its complaint, the plaintiff alleges that treaties to which the United States is a party, the Paris Convention of March 20, 1883, as amended, and the Pan-American Convention of August 20, 1910, were violated by the defendant.

Mannington asserts that it is a "person" enjoying rights under the treaties and has been harmed by the defendant's use of false claims of priority dates in prosecuting patents. The district court dismissed this count of the complaint on the ground that the treaties do not provide a private right of action.

 A treaty of the United States is a contract with another nation which becomes the law of this country. U.S.Const. art. VI, cl. 2; *Dreyfus v. Von Finck,* 534 F.2d 24, 29 (2d Cir.), *cert. denied,* 429 U.S. 835, 97 S.Ct. 102, 50 L.Ed.2d 101 (1976). Like private rights under law, a treaty may confer rights capable of enforcement. *Z. & F. Assets Realization Corp. v. Hull,* 72 App. D.C. 234, 240, 114 F.2d 464, 470, (D.C. Cir.) *aff'd on other grounds,* 311 U.S. 470, 61 S.Ct. 351, 85 L.Ed. 288 (1941), but this is not the general rule. As the Court explained in *Head Money Cases [Edye v. Robertson],* 112 U.S. 580, 598–99, 5 S.Ct. 247, 254, 28 L.Ed. 798 (1884):

> "A treaty, then, is a law of the land as an act of Congress is, whenever its provisions prescribe a rule by which the rights of the private citizen or subject may be determined."

Thus, unless a treaty is self-executing, it must be implemented by legislation before it gives rise to a private cause of action. *Diggs v. Richardson,* 180 U.S.App.D.C. 376, 555 F.2d 848 (D.C. Cir. 1976); *Dreyfus v. Von Finck, supra.*

 Mannington has pointed to neither self-executing provisions of the treaty nor implementing legislation. On examining Article 17 of the Paris Convention, however, we find an expression contrary to the concept of a private right of action. It reads:

> "Every country party to this Convention undertakes to adopt, in accordance with its constitution, the measures necessary to insure the application of this Convention."

> * * * * * *

...ing th...may well determine that ...is appropriate and that ...eet incidental enforce-...designed. But in our

view, the record on this 12(b)(6) dismissal is inadequate to allow a reasoned decision on that issue as well as the others we have enumerated.

"It is understood that at the time an instrument of ratification or accession is deposited on behalf of a country, such country will be in a position under its domestic law to give effect to the provisions of this Convention." [1962] 13 U.S.T. 1, 41.

Similarly, Article IX of the Pan-American Convention states:

"Persons who incur civil or criminal liabilities, because of injuries or damages to the rights of inventors, shall be prosecuted and punished, in accordance with the laws of the countries wherein the offense has been committed or the damage occasioned." 38 Stat. 1815.

Both treaties, therefore, are at odds with a contention that they are self-executing. Finding no indication that a private right of action was conferred by the treaties, we conclude that the district court did not err in dismissing Count III of the complaint.

Inasmuch as the state unfair competition claim was dismissed because no federal causes of action were found to exist, the district court should be free to reconsider that count if it decides it should exercise jurisdiction under the antitrust claims. Accordingly, the unfair competition count will also be remanded.

The judgment of the district court dismissing Count III of the complaint will be affirmed. The judgment dismissing Counts I and II will be vacated and the matter remanded to the district court for further proceedings consistent with this opinion. Both parties to bear their own costs.

ADAMS, Circuit Judge, concurring.

I join in Parts II and IV of the majority opinion, which hold, respectively, that the act of state doctrine does not preclude adjudication of Mannington's antitrust claim and that the treaties of 1883 and 1910 do not provide Mannington a private right of action. The approach I take to Mannington's antitrust claim diverges substantially, however, from that taken by the majority and I therefore write separately on that matter.

My differences with the majority regarding Mannington's basic claim are threefold. First, I believe that the rationale of *Walker Process* is applicable to the fraudulent procurement of foreign patents and that therefore Mannington's complaint has set forth a claim upon which relief can be granted. Second, I do not agree that a court may conclude that it is invested with subject-matter jurisdiction under the Sherman Act but may nonetheless abstain from exercising such jurisdiction in deference to considerations of international comity; rather, it seems that those considerations are properly to be weighed at the outset when the court determines whether jurisdiction vel non exists, or in fashioning the decree. Third, it appears evident that notwithstanding the foreign elements involved, jurisdiction exists in the present case, and that possible repercussions abroad should be examined by the court when and if it formulates a remedy.

Apart from my disagreement on specific points, it appears that the majority is influenced to some extent by Congoleum's contention that this claim is really a conglomeration of twenty-six distinct, foreign patent fraud suits and that therefore Mannington should be relegated to the courts of the various foreign countries for vindication of its rights. Admittedly, Mannington's complaint presents a complex and novel problem regarding the proper accommodation between American antitrust and foreign patent laws as they relate to the fraudulent procurement of foreign patents. Conceivably Mannington could have sued in the courts of each country to invalidate Congoleum's patents, but it chose not to do so. Mannington does not denominate this lawsuit as one for patent fraud, nor does it seek to have any of the foreign patents declared invalid. Instead, its claim is grounded on an alleged infraction of § 2 of the Sherman Act, and it must therefore be treated as such.

Accordingly, Mannington's complaint should be analyzed, as I view it, by engaging in a dual inquiry into first, whether the challenged conduct affects "commerce . . . with foreign nations" so as to be within the

jurisdictional scope of the Sherman Act, and second, whether there is a monopolization or attempted monopolization of trade or commerce so as to be violative of the Act. Although these are separate questions, courts have generally recognized, albeit in other contexts, that a final determination as to the existence of subject-matter jurisdiction must often await some clarification of the substantive offense.[1] This interrelationship between the jurisdictional and substantive issues seems to be borne out in the present case, where an understanding of the substantive offense sheds light on whether jurisdiction exists.

In essence, Mannington alleges that Congoleum set out to monopolize the foreign trade relating to chemically embossed vinyl floor covering by fraudulently securing patents in twenty-six foreign countries, thereby giving Congoleum the power to prevent American competitors from shipping such material to purchasers in those countries. That Mannington's allegation states a claim under § 2 of the Sherman Act is, I believe, a necessary inference from *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.,* 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965). There, the Supreme Court addressed one facet of the tension that exists between the Sherman Act, which outlaws monopolies, and United States patent law, which creates "an exception to the general rule against monopolies and to the right to access to a free and open market."[2] Seeking to reconcile the differ-

ing policies of the patent. and antitrust laws, the Court held that a patentee is stripped of its exemption from the antitrust laws when it obtains its patent by knowingly and willfully misrepresenting facts to the patent office. As explained by Justice Harlan in his concurring opinion,

> To hold, as we do, that private suits may be instituted under § 4 of the Clayton Act *to recover damages for Sherman Act monopolization knowingly practiced under the guise of a patent procured by deliberate fraud,* cannot well be thought to impinge upon the policy of the patent laws to encourage inventions and their disclosure. Hence, *as to this class of improper patent monopolies, antitrust remedies should be allowed room for full play.*[3]

Thus, the Supreme Court has declared that the fraudulent procurement of a patent may properly be viewed from the vantage point of antitrust regulation as well as from the perspective of possible patent invalidity, and that monopolistic conduct is not sheltered from the purview of the antitrust laws merely because it involves the fraudulent procurement of patent rights. This underlying rationale of *Walker Process* appears to be just as applicable to monopolization through the fraudulent acquisition of foreign patents as it is to monopolization through the fraudulent acquisition of United States patents. And, in the words of Justice Harlan, "as to this class of improper patent monopolies, antitrust remedies should be allowed room for full play."[4]

---

1. *See, e. g., Mortensen v. First Federal Savings and Loan Association,* 549 F.2d 884, 890–98 (3d Cir. 1977) (dismissal of suit charging violation § 1 of the Sherman Act for want of subject-matter jurisdiction was held to be premature because same facts are relevant for ascertaining jurisdiction as well as the substantive offense). *See also* Ongman, *"Be No Longer a Chaos": Constructing a Normative Theory of the Sherman Act's Extraterritorial Jurisdictional Scope,* 71 Nw.U.L.Rev. 733, 733–735 (1977).

2. *Walker Process, supra,* 382 U.S. at 177, 86 S.Ct. 347, *quoting Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.,* 324 U.S. 806, 816, 65 S.Ct. 993, 89 L.Ed. 1381 (1945).

3. 382 U.S. at 179–80, 86 S.Ct. at 351. (emphasis added).

4. *Id.* Concededly, it may be that unlike fraudulently procured American patents, a number of foreign patents will remain valid under foreign law notwithstanding their fraudulent procurement. But that does not appear relevant to the question whether the holder of such a foreign patent has monopolized trade in violation of the Sherman Act. However, as discussed in the text *infra,* the continued validity of a foreign patent may have some bearing on the formulation of an antitrust remedy.

The majority opinion appears to sidestep the question whether *Walker Process* applies to the fraudulent procurement of a foreign patent, but cites one commentator who suggests that

With this understanding of the substantive offense charged, we may now turn to the question whether there is a monopolization of "trade or commerce . . . with foreign nations" so as to invest the federal courts with subject-matter jurisdiction. Although the test for subject-matter jurisdiction has traditionally been framed in terms of whether there is an actual or intended effect upon foreign commerce,[5] it has also been recognized that "anything that affects the external trade and commerce of the United States also affects the trade and commerce of other nations, and may have far greater consequences for others than for the United States."[6] Thus, Judge Learned Hand, when first formulating the "effects" test, observed:

[W]e are not to read general words, such as those in this Act, without regard to the limitations customarily observed by nations upon the exercise of their powers; limitations which generally correspond to those fixed by the "Conflict of Laws." We should not impute to Congress an intent to punish all whom its courts can catch, for conduct which has no consequence within the United States.[7]

A "jurisdictional rule of reason,"[8] incorporating concepts from conflicts of laws, has therefore emerged, though admittedly this approach has not always been given explicit recognition in the cases. The appropriate approach has been articulated most precisely in *Timberlane Lumber Co. v. Bank of America, N. T. & S. A.,* 549 F.2d 597 (9th Cir. 1972):

A tripartite analysis seems to be indicated. As acknowledged above, the antitrust laws require in the first instance that there be *some* effect—actual or intended—on American foreign commerce before the federal courts may legitimately exercise subject matter jurisdiction under those statutes. Second, a greater showing of burden or restraint may be necessary to demonstrate that the effect is sufficiently large to present a cognizable injury to the plaintiffs and, therefore, a civil *violation* of antitrust laws. *Occidental Petroleum,* 331 F.Supp. at 102–03; Beausang, The Extraterritorial Jurisdiction of the Sherman Act, 70 Dick.L.Rev. 187, 191 (1966). Third, there is the additional question which is unique to the international setting of whether the interests of, and links to, the United States—including the magnitude of the effect on American foreign commerce— are sufficiently strong, vis-a-vis those of other nations, to justify an assertion of extraterritorial authority.[9]

---

*Walker Process* should be limited to situations involving United States patents. *Supra* at pp. 1295–1296 & n. 5. The reason advanced for such a limitation is that American patents are unique in that it is very important to determine at the outset whether an American patent is valid, because we do not police profits or require licensing, thereby making it necessary to have "additional engraftings on the elements of validity," including "the doctrine that fraudulently obtaining a patent is an antitrust violation." Such an "engrafting" is unnecessary, it is asserted, with respect to foreign patents. It would seem, however, that this argument is flawed in that it subordinates the Sherman Act to patent law policies; it implies that *Walker Process* was a special enlargement of the antitrust laws designed to deal with the problem of identifying invalid patents, instead of recognizing that *Walker Process* merely removed the limited patent exception to the antitrust laws in those circumstances where a patent has been obtained by deliberate fraud.

5. *See generally Timberlane Lumber Co. v. Bank of America, N. T. & S. A.,* 549 F.2d 597, 609–12

(9th Cir. 1976); Kintner & Griffin, *Jurisdiction Over Foreign Commerce Under the Sherman Antitrust Act,* 18 B.C.Ind. & Comm.L.Rev. 199 (1977).

6. *Timberlane, supra,* 549 F.2d at 611, *quoting* Katzenbach, *Conflicts on an Unruly Horse,* 65 Yale L.J. 1087, 1150 (1956).

7. *United States v. Aluminum Co. of America,* 148 F.2d 416, 443 (2d Cir. 1945).

8. *See* K. Brewster, Antitrust and American Business Abroad 446 (1958).

9. 549 F.2d at 613. *See also Pacific Seafarers, Inc. v. Pacific Far East Line, Inc.,* 131 U.S.App. D.C. 226, 236–37, 404 F.2d 804, 814–15 (1968), *cert. denied,* 393 U.S. 1093, 89 S.Ct. 872, 21 L.Ed.2d 784 (1969). The majority apparently is of the view that the existence of jurisdiction is to be determined solely under an "effects" standard, but that a court may then decline to exercise jurisdiction because of considerations of international comity. As I understand it,

The third leg of the jurisdictional test reflects, of course, the principle expressed in the Restatement (Second) of Foreign Relations Law of the United States § 40:

> Where two states have jurisdiction to prescribe and enforce rules of law and the rules they may prescribe require inconsistent conduct upon the part of a person, each state is required by international law to consider, in good faith, moderating the exercise of its enforcement jurisdiction, in the light of [various factors] . . . .

It is important to note, however, that this concern for international comity does not require that the Sherman Act, or any other statute, not be enforced extraterritorially whenever a party's conduct is also subject to regulation by a foreign government. It is only when foreign law requires conduct *inconsistent* with that mandated by the Sherman Act that problems of international comity become significant. And even in such circumstances, it is recognized that extraterritorial jurisdiction may be asserted if the relevant factors, some of which are enumerated in the majority opinion, weigh in favor of the exercise of jurisdiction.

Relating this jurisdictional test to the present case, it is manifest that jurisdiction exists because there is no indication that Congoleum was conforming to a rule of conduct prescribed by foreign law when it allegedly undertook a scheme to monopolize trade with purchasers in twenty-six foreign nations by fraudulently procuring patents in those nations. Nor has it been suggested that Congoleum was compelled by foreign law to make materially false representations in connection with its patent applications. The dictate of the Sherman Act that Congoleum refrain from monopolizing foreign commerce is thus not at variance in this regard with the commands of any foreign nation.[10] In addition, Congoleum is an American company and is alleged to have masterminded and directed its monopolization scheme from its headquarters in Kearney, New Jersey, with the intention of affecting its American competitors' export markets. Given these alleged facts, there appears to be no reason why Congoleum should not be held accountable in the courts of the United States for monopolizing trade with foreign nations.

Problems may, of course, arise regarding the formulation of relief, but they do not appear to constitute a threshold jurisdictional barrier. Instead, they are matters that can be dealt with, if need be, at a subsequent stage of the litigation. Indeed, it would appear that there would not be any interference with the policies of foreign nations if relief were limited to treble damages, and the public interest in enforcing the antitrust laws, as well as the private interest of Mannington in obtaining a remedy, may be satisfied in large measure through such an award.

---

however, a court may not abstain where jurisdiction properly lies unless abstention is warranted under a recognized abstention doctrine. *See, e. g., McClellan v. Carland,* 217 U.S. 268, 281, 30 S.Ct. 501, 54 L.Ed. 762 (1910); *Cohens v. Virginia,* 19 U.S. (6 Wheat.) 264, 404, 5 L.Ed. 257 (1821) ("It is most true, that this court will not take jurisdiction if it should not: but it is equally true that it must take jurisdiction, if it should. . . . We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.") *See generally* P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, *Hart and Wechsler's The Federal Courts and the Federal System,* 1258–59 (2d ed. 1973). And to my knowledge no abstention doctrine exists with respect to considerations of international comity. Rather, as *Timberlane* and *Pacific Seafarers* demonstrate, such considerations have been incorporated into an expanded jurisdictional test.

**10.** In this respect, this case presents a less problematical situation for application of the Sherman Act than was presented in *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969), which was criticized in Note, *American Antitrust Law and Canadian Patent Rights,* 118 U.Pa.L.Rev. 983 (1970), for ignoring the fact that Canadian law apparently required the restrictive patent licensing policy that was under attack in that case. The present case is also readily distinguishable from those situations, referred to by the majority, where a litigant who has been ordered by an American court to produce records maintained in a foreign country would be in violation of foreign law if it complied with the American court order.

Injunctive relief may also be utilized effectively if the district court deems such a remedy to be appropriate. Where, as here, the district court has personal jurisdiction over the defendant, there might well be no problem in ensuring compliance with its order, whether it prohibits Congoleum from prosecuting infringement suits or requires the licensing of competitors. Moreover, it is improbable that such an order would place Congoleum in the position of being forced to perform an act that is illegal in foreign countries, since patent rights primarily benefit the patent holder rather than the foreign government. At most, the omission to prosecute patent infringers or the unauthorized licensing of others may subject Congoleum to loss of its patent right, which in any event may well be invalid under foreign law because of its fraudulent procurement.

Thus, it is likely that the policies of most foreign nations will not be adversely affected by granting injunctive relief to Mannington. And if, for some reason, the patent laws and policies of one or two countries would be seriously affected—a proposition that incidentally is nowhere suggested in the record—the court can take these specific circumstances into account when fashioning its remedy, as other courts have done in the past.[11]

In sum, then, I would conclude that subject-matter jurisdiction exists over Mannington's antitrust cause of action and that Mannington has stated a claim upon which relief can be granted. Accordingly, I would remand the case to the district court for proceedings on the merits, at which time Mannington would be obligated to establish, as required under *Walker Process,* both that Congoleum procured the foreign patents through knowing and willful fraud and that such conduct constituted monopolization of a relevant market of the foreign trade of the United States.

11. *See, e. g., United States v. General Electric Co.,* 115 F.Supp. 835 (D.N.J.1953); *United States v. Imperial Chemical Industries,* 105 F.Supp. 215 (S.D.N.Y.1952) (in each case, savings clause included in order so as not to place defendant in violation of foreign laws). *See generally* Beausang, *The Extraterritorial Jurisdiction of the Sherman Act,* 70 Dick.L.Rev. 187, 194–95 (1966).