In re URANIUM ANTITRUST LITIGATION.

WESTINGHOUSE ELECTRIC CORPORATION,
Plaintiff-Appellee,

v.

RIO ALGOM LIMITED, Rio Algom Corporation, Rio Tinto Zinc Corporation Limited, RTZ Services Limited, Rio Tinto Zinc Corporation, Conzinc Rio Tinto of Australia Limited, Mary Kathleen Uranium Limited, Pancontinental Mining Limited, Queensland Mines Limited, Nuclear Fuels Corporation, Anglo-American Corporation of South Africa, Limited, Engelhard Minerals and Chemicals Corporation, Denison Mines Limited, Denison Mines (U.S.) Incorporated, Noranda Mines Limited, Gulf Oil Corporation, Gulf Minerals Canada Limited, Kerr-McGee Corporation, the Anaconda Company, Getty Oil Company, Utah International Inc., Phelps Dodge Corporation, Western Nuclear, Inc., Homestake Mining Company, Federal Resources Corporation, Pioneer Nuclear, Inc., Atlas Corporation, Reserve Oil and Minerals Corporation, United Nuclear Corporation, and Atlas Alloys, Inc., Defendants-Appellants.

Nos. 79–1427, 79–1502, 79–1641, 79–2004 and 79–2318 to 79–2321.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 20 and Nov. 9, 1979.

Decided Feb. 15, 1980.

See also, D.C., 473 F.Supp. 393.

Keith F. Bode, Jenner & Block, Chicago, Ill., for appellant, Rio Algom.

Carl J. Schuck, Los Angeles, Cal., for appellant, Getty Oil Co.

Jonathan G. Bunge, Chicago, Ill., for appellant Gulf Oil Corp.

Jeffrey N. Cole, Jeffrey N. Cole, Ltd., Chicago, Ill., for appellant, Atlas Alloys, Inc.

William J. T. Brown and Samuel W. Murphy, New York City, for appellee, Westinghouse Corp.

Before SWYGERT,[a] BAUER[b] and WOOD, Circuit Judges,[c] and CAMPBELL, Senior District Judge.[d]

WILLIAM J. CAMPBELL, Senior District Judge.

In October of 1976, plaintiff-appellee, Westinghouse Electric Corporation, filed a complaint alleging anti-trust violations against twenty-nine foreign and domestic uranium producers. All of the defendants were duly served with process; however, nine foreign defendants chose not to appear.[1] On February 2, 1977, the District Court entered defaults pursuant to Rule 55(a) of the Federal Rules of Civil Procedure against each of the nine defaulting defendants. In August 1977, Westinghouse moved for entry of final judgment against the defaulters on the issue of liability. On January 3, 1979, the District Court granted the motion for entry of default judgment against the defaulting defendants.

On January 12, 1979, Westinghouse moved *ex parte* for a temporary restraining order and for a preliminary injunction seeking to require the defaulting defendants to give twenty days' prior notice to the Court of any transfers of assets in excess of $10,000 out of the United States. In support of the motion, counsel for Westinghouse submitted an affidavit stating that several of the defaulters, and particularly Rio Tinto Zinc Corp. Ltd. of London, held substantial assets in the United States through wholly owned subsidiaries. Westinghouse counsel further stated that there was reason to believe that those assets were being, or were about to be, removed from the United States to avoid execution on the default judgment entered on January 3, 1979.

On January 15, 1979, the District Court temporarily restrained transfers in excess of $10,000 pending a hearing on January 24. On the latter date, the District Court entered the preliminary injunction sought by Westinghouse.

Notice of the TRO was served on the defaulting defendant, Rio Tinto Zinc Corp. (RTZ), in London, on January 17, 1979. Rio Algom Limited in Canada was served with notice of the TRO that same day. It was later learned that within hours after notice of the TRO, RTZ instructed employees of its subsidiaries to transfer as much money as possible out of American bank accounts and into Canada. Approximately three million two hundred thousand dollars were transferred from the accounts of Atlas Alloys to Rio Algom Limited in Canada. Neither the plaintiff nor the District Court were given notice of these transfers, in apparent violation of the TRO and the subsequent preliminary injunction.

On January 25, 1979, Atlas Alloys moved for an exemption from the preliminary injunction, seeking to make arms length purchases of steel or metal products in the ordinary course of business in amounts of less than $40,000. Approximately one month later, Atlas Alloys gave twenty days' advance notice that it intended to pay its defaulting parent, Rio Algom Limited[2] ap-

a. Circuit Judge Swygert presided on both panels.

b. Circuit Judge Bauer was a member of the panel on Appeal Nos. 79–2318, 79–2319, 79–2320 and 79–2321.

c. Circuit Judge Wood was originally a member of the panel in Appeal Nos. 79–1427, 79–1502, 79–1641 and 79–2004, but after oral argument facts came to his attention which he deemed disqualifying and therefore did not participate further.

d. Senior District Judge Campbell of the United States District Court of the Northern District of Illinois, is sitting by designation.

1. See footnote 11 for a list of the defaulting defendants.

2. A brief explanation of the relationship between the parties: Rio Algom Corporation is a Delaware corporation and is an answering defendant in this action. Rio Algom Corporation is owned by Atlas Alloys, Inc., also a Delaware corporation but not a party to this litigation. Atlas Alloys is in turn owned by Rio Algom Limited, a Canadian corporation and a defaulting defendant in this litigation. Rio Algom

proximately $1.6 million dollars, which had been owed to Rio Algom Limited for some time. Westinghouse moved to enjoin the proposed transfer and sought to require Atlas Alloys to pay the funds into a trust account under the jurisdiction of the District Court. The District Court heard argument on the question and indicated that a ruling would be forthcoming shortly. In the interim, Atlas Alloys transferred about $1.2 million dollars to its defaulting parent by means of writing 124 separate checks for amounts slightly less than $10,000. On March 27, 1979, the District Court enjoined the transfer of the $1.6 million dollars, and required that the funds be deposited in a trust account with the Court. The Court also found that five out of six of Atlas Alloys' top officers and directors were also officers and directors of the defaulting defendant, Rio Algom Limited. The District Court further found that the monies which Atlas Alloys sought to transfer out of the United States to its parent, Rio Algom Limited in Canada, were assets of Rio Algom Limited here in the United States and that the entirety of Atlas Alloys is an asset of Rio Algom Limited.

On March 27 and April 2, 1979, Atlas Alloys gave further notice of its intent to make transfers of an additional $168,000 to its defaulting parent. Westinghouse again moved to enjoin these transfers, and to have the monies deposited in a trust account. At this time Westinghouse also moved for further injunctive relief against Atlas Alloys based on the discovery of Atlas Alloys' practice of transferring funds out of the United States by means of checks written for amounts slightly under $10,000. At that point Atlas Alloys had written 481 checks for a total of $3.9 million dollars to its defaulting parent.

On May 4, 1979, the District Court entered a third injunction. The Court en-joined the proposed transfer of $168,000 from Atlas Alloys and, based on evidence of the transfers to Rio Algom Limited, the Court granted further injunctive relief requiring that all transfers of funds be approved by the Court upon twenty days' prior written notice, regardless of amount.

Westinghouse also moved for similar injunctive relief to preserve the assets of Rio Algom Corporation, the wholly-owned subsidiary of Atlas Alloys. Rio Algom Corporation is a Delaware corporation engaged in uranium mining in Utah. In its motion Westinghouse sought to enjoin Rio Algom Corporation from making deposits in bank accounts outside the United States; from making any transfers out of the United States without twenty days' prior notice to the Court; requiring Rio Algom to deposit the revenues of its Utah mining operation in United States banks; and enjoining the officers, directors and employees of the defaulting Rio Algom Limited from making withdrawals from bank accounts of Rio Algom Corporation. On June 20, 1979, the District Court granted Westinghouse's motion for a preliminary injunction. The Court likened the situation respecting Rio Algom Corporation to the actions of its parent, Atlas Alloys. The Court noted that the single difference was that Rio Algom Corporation, unlike Atlas Alloys, was a defendant in the anti-trust action. The Court concluded, however, that the injunction would in no way impair Rio Algom Corporation's ability to defend on the merits.

The three injunctions against the defaulters in respect to the assets of Atlas Alloys and the one injunction against Rio Algom Corporation comprise the first interlocutory appeal pending before this Court. The Court has jurisdiction to consider these injunctions pursuant to 28 U.S.C. § 1292(a)(1). The Court [3] heard oral argument on the

---

Limited and numerous other companies, including defaulting defendants, Mary Kathleen Uranium Ltd. and Conzinc Rio Tinto of Australia and answering defendant Rio Tinto Zinc Corporation of America, are all owned by the defaulting defendant Rio Tinto Zinc Corp. Ltd., a British corporation.

**3.** Judges Swygert, Wood and Campbell.

appropriateness of the injunctions on September 20, 1979.[4]

Shortly after the Court heard oral argument on the first appeal, Rio Algom Corporation, Gulf Oil Corporation, and an additional group of answering defendants led by the Getty Oil Corporation filed a petition for further interlocutory review.[5] The District Court certified that the issues raised in this appeal are controlling questions of law to which there is room for substantial disagreement, and that the matter is appropriate for interlocutory review pursuant to 28 U.S.C. § 1292(b). This Court concurred with the District Court and accepted the matter for immediate review.[6]

This appeal arises out of an Order of September 17, 1979, in which the District Court denied motions filed by the answering defendants seeking to postpone any hearing on damages as to the defaulting defendants until after trial on the merits. The appellants claim that the January 3, 1979, entry of default judgment and the subsequent determination to proceed to a damages hearing are an abuse of discretion by the District Judge. The appellants claim that the entry of judgment against the defaulting defendants prior to adjudication on the merits as to the answering defendants is prohibited by *Frow v. De La Vega*, 82 U.S. (15 Wall.) 552, 21 L.Ed. 60 (1872), and that they will be severely prejudiced by a determination as to damages against the defaulting defendants.[7]

The *Frow* case involved the entry of a default judgment against one defendant in a multi-defendant action. De La Vega filed a complaint claiming that eight defendants had conspired to defraud him of title to a tract of land. Frow defaulted while the other defendants contested the allegations and won on the merits. Subsequently, Frow successfully petitioned the Supreme Court to vacate the default judgment.[8]

When the District Judge entered default judgment on January 3, 1979 against the nine defaulters, he considered the applicability of *Frow* to the present action. The Court found that the judgment "pro confesso" entered in *Frow* was akin to the modern day default judgment under Rule 55(b). Nevertheless, the Court concluded that the entry of default judgment was appropriate. The District Judge reasoned that the 1961 amendments to Rule 54(b) permitting a final adjudication as to one or more but fewer than all of the parties to an action requires a balancing between the "premature decision making" addressed in *Frow* and the "pragmatic needs of the litigants in complex multiple party actions."[9]

In striking that balance, the District Judge concluded that three factors outweighed the policies set out in *Frow*: the need for partial final judgments in complex modern civil actions; the possibility that the foreign defaulters might conceal or transfer assets subject to execution by United States Courts;[10] and the seriousness of the charges in the complaint, together with the willful and deliberate

---

**4.** A discussion of the parties' views as to the issues raised in that appeal is contained at Part III, *infra*.

**5.** The appellants are all answering defendants. They are the "Getty Group," which include in addition to Getty, Phelps Dodge Corporation, Western Nuclear, Inc., Noranda Mines, Ltd., Denison Mines, Ltd., Denison Mines (U.S.) Inc., Engelhard Minerals & Chemicals Corporation, Federal Resources and Pioneer Nuclear, Inc. The Gulf Oil Corporation has appealed on its own behalf and on behalf of its wholly owned subsidiary, Gulf Minerals Canada Ltd. Rio Algom Corporation is also a participant in this appeal. In addition, counsel for the Getty Group have informed the Court that Kerr-McGee Corporation, The Anaconda Company,

Homestake Mining Co. and Utah International, Inc. support the views expressed in their brief.

**6.** Judges Swygert, Sprecher and Bauer.

**7.** See discussion of the possible prejudice to the answering defendants, Part IV *infra*.

**8.** See discussion of the applicability of *Frow v. De La Vega*, Part II *infra*.

**9.** *In re Uranium Antitrust Litigation*, 473 F.Supp. 382, p. 389 (D.C.1979), No. 76–C–3830.

**10.** The subsequent transfers of funds by Rio Algom Limited supports the Court's conclusion that this was a very real concern.

avoidance of those charges by the defaulting defendants.

The appellants contend that this determination by the District Judge, and his subsequent decision to proceed to damages are contrary to *Frow*, and therefore an abuse of discretion.

As an alternative basis for his holding, the District Judge relied on Rule 37(b) of the Federal Rules of Civil Procedure. That rule simply permits the imposition of sanctions against parties who fail to attend depositions, serve answers to interrogatories, or respond to requests for inspection. While the rule does not mention default judgment as a sanction for failure to participate in discovery, the entry of a default judgment for failure to participate in discovery has been upheld by the Supreme Court. *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 643, 96 S.Ct. 2778, 2781, 49 L.Ed.2d 747 (1977).

In addition to these issues raised by the appellants, a significant issue has been raised by amici curiae. The amici request that this Court remand the case to the District Court to conduct an analysis of the international ramifications of this case in order to determine whether subject matter jurisdiction exists, and whether it should be exercised. Because the concerns of the amici curiae call into question the Court's jurisdiction, those matters must be resolved at the outset.

## I. JURISDICTION

The governments of Australia, Canada, South Africa and the United Kingdom of Great Britain and Northern Ireland [11] have filed briefs as amici curiae. The principal thrust of the amici's briefs is to call into question the jurisdiction of the United States District Court over this controversy.

We view the jurisdictional issue as two-pronged: (1) does subject matter jurisdiction exist; and (2) if so, should it be exercised?

■ The jurisdictional reach of the Sherman Act to conduct outside the United States was not favorably received at the outset. *See American Banana Co. v. United Fruit Co.*, 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826 (1909). However, that view was later eroded, and the Act was applied to conduct outside the United States so long as some of the acts occurred within the United States and the parties were American. *United States v. Sisal Sales Corp.*, 274 U.S. 268, 47 S.Ct. 592, 71 L.Ed. 1042 (1927). *Timkin Roller Bearing Co. v. United States*, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951). In *United States v. Aluminum Co. of America (Alcoa)*, 148 F.2d 416 (2nd Cir. 1945), Judge Learned Hand articulated what is known as the "intended effects" test. In *Alcoa* Judge Hand reasoned that agreements made outside of the United States which restrain trade or commerce within the United States have the same effect as similar agreements entered into within our borders. Since "any state may impose liabilities, even upon persons not within its allegiance, for conduct outside its borders that has consequences within its borders which the state reprehends," [12] he concluded that Congress did intend to apply the Act to conduct abroad so long as the intended effect of that conduct is prohibited by the Act. Since *Alcoa*, United States Courts have exercised jurisdiction over antitrust activity outside the United States so long as there is an intended effect on American commerce. *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 705, 82 S.Ct. 1404, 1413, 8 L.Ed.2d 777 (1962); *Mannington Mills v. Congoleum Corporation*, 595 F.2d 1287, 1299 (3rd Cir.

---

**11.** Four Australian companies are in default: Conzinc Rio Tinto of Australia Ltd., Mary Kathleen Uranium Ltd., Pancontinental Mining Ltd., and Queensland Mines Ltd. Two British companies are in default: Rio Tinto Zinc Corp. Ltd. and RTZ Services Ltd. Two South African companies are in default: Nuclear Fuels Corporation of South Africa, and Anglo-American Corporation of South Africa Ltd. One Canadian corporation is in default: Rio Algom Limited.

**12.** Id. at 443.

1979);[13] *U. S. v. The Watchmakers of Switzerland Information Center, Inc.*, 1963 Trade Cases ¶ 70,600, at p. 77, 456–57 (S.D. N.Y.1962); *Fleischman Distilling Corp. v. Distillers Co. Ltd.*, 395 F.Supp. 221, 226–227 (S.D.N.Y.1975).

In its complaint Westinghouse alleges that twenty domestic and nine foreign corporations conspired to fix the price of uranium in the world market. The alleged meetings at which Westinghouse claims prices were agreed upon took place in France,[14] Australia,[15] South Africa,[16] Illinois,[17] the Canary Islands[18] and England.[19] At the present state of this litigation, there has been no opportunity for fact-finding.[20] We must therefore accept all properly pleaded allegations as true for purposes of determining jurisdiction. Accordingly, the picture which emerges is one of concerted conduct both abroad and within the United States intended to affect the uranium market in this country. While the governments of the foreign participants in this alleged conspiracy are actively and admittedly sympathetic to the economic determinism of the defaulters, there is no claim that the alleged conduct of the defaulters is mandated by those governments.[21] We therefore conclude that Westinghouse's allegations

against the defaulters do fall within the jurisdictional ambit of the Sherman Act, as defined in *Alcoa*.

The amici, in particular the United Kingdom contend that *Alcoa* is "no longer to be accepted by United States Courts as 'settled law' ", in light of the recent opinions of the United States Courts of Appeals in *Timberlane Lumber Co. v. Bank of America, N.T. & S.A.*, 549 F.2d 597 (9th Cir. 1976) and *Mannington Mills, Inc. v. Congoleum Corporation*, 595 F.2d 1287 (3rd Cir. 1979). In those cases the Courts were faced with a dismissal of an antitrust claim brought by an American company against an American corporation for conduct in a foreign country; and against a foreign subsidiary of an American corporation for illicit conduct abroad. Each Court began its analysis with the questions of whether the complaint stated a claim and whether subject matter jurisdiction existed. Both Courts answered those questions in the affirmative.[22] In each case the Court reversed the District Court and remanded the case for a determination as to whether jurisdiction should be exercised. The Third Circuit set forth factors for the District Court to consider in resolving that question.[23] Those factors

13. The United Kingdom asserts that *Mannington Mills* represents a departure from the *Alcoa* "intended effects" test. However, we read *Mannington Mills* as affirming the "intended effects" test within the factual context of that case.

14. Westinghouse Complaint ¶ 36.

15. Id.

16. Id. ¶¶ 38 and 50.

17. Id. ¶¶ 42 and 46. ·

18. Id. ¶ 51.

19. Id. ¶ 54.

20. Indeed, so long as the nine defaulting foreign corporations refuse with specific support of their respective Governments to appear and contest the allegations of the complaint, including those upon which jurisdiction is asserted, they have made it virtually impossible to arrive at any further findings.

21. Thus, there can be no claim that the alleged conduct is protected from adjudication by American Courts under the Act of State doctrine. *See Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964). American Courts will not interfere with the implementation of the laws of another sovereign. However, when a foreign sovereign simply approves or condones certain conduct, the Act of State doctrine is not a defense. *Mannington Mills v. Congoleum*, 595 F.2d 1287, 1293 (3rd Cir. 1979).

22. *Timberlane* at 615. *Mannington Mills* at 1292.

23. Those factors are: Degree of conflict with foreign law or policy; nationality of the parties; relative importance of the alleged violation of conduct here compared to that abroad; availability of a remedy abroad and the pendency of litigation there; existence of intent to harm or affect American commerce and its foreseeability; possible effect upon foreign relations if the court exercises jurisdiction and grants relief; if relief is granted, whether a party will be placed in the position of being forced to perform an

were employed by the Court in *Mannington Mills*.[24]

The United Kingdom relies primarily on the comment in *Timberlane* that "The effects test by itself is incomplete because it fails to consider other nations' interests." [25] This amicus curiae contends the critical discussion of the *Alcoa* effects test has undermined its continuing viability as the standard of extraterritorial jurisdiction of the Sherman Act. We do not read *Timberlane* so broadly. The "jurisdictional rule of reason" [26] espoused in *Timberlane* is that while an effect on American commerce is the necessary ingredient for extraterritorial jurisdiction, considerations of comity and fairness require a further determination as to "whether American authority *should* be asserted in a given case." [27] The clear thrust of the *Timberlane* Court is that once a district judge has determined that he has jurisdiction,[28] he should consider additional factors to determine whether the exercise of that jurisdiction is appropriate.

We conclude that nothing in *Timberlane* is inconsistent with our determination that Westinghouse's allegations of concerted conduct by foreign and domestic corporations are sufficient to confer jurisdiction on the District Court, under *Alcoa*. We turn now to the question of whether jurisdiction should be exercised in the present case.

■ In this case, unlike the situation in *Timberlane* and *Mannington Mills*, there has been a determination by the District Court as to whether jurisdiction should be exercised. In the order of January 3, 1979, and the order of September 17, 1979, the District Judge considered the unique circumstance presented in this case, and determined, in the exercise of his discretion, to proceed. Our task is to decide whether he abused his discretion in reaching that conclusion. We find that he did not.

In granting the requested default judgment, the District Court considered three factors: [29] the complexity of the present multi-national and multi-party action; the seriousness of the charges asserted; and the recalcitrant attitude of the defaulters.[30] The District Judge concluded that those factors all weighed heavily in favor of proceeding to judgment and damages.

The amici suggest that the District Court abused its discretion by not considering the factors set out in *Mannington Mills* in reaching this determination. While the considerations recommended in that case certainly provide an adequate framework for such a determination, we can hardly call the failure to employ those precise factors an abuse of discretion. First, the *Mannington Mills* factors are not the law of this Circuit. Second, even assuming their adoption by this Court, the circumstances here are distinct from those found in *Timberlane* and *Mannington Mills*. In those cases the defendants appeared and contested the jurisdiction of the District Court. In the present case, the defaulters have contumaciously refused to come into court and present evidence as to why the District

---

act illegal in either country or be under conflicting requirements by both countries; whether the Court can make its order effective; whether an order for relief would be acceptable in this country if made by the foreign nation under similar circumstances; and whether a treaty with the affected nations has addressed the issue. *Mannington Mills* at 1297–1298.

24. 595 F.2d at 1297–1298.

25. 549 F.2d at 611–612. Since we conclude that *Timberlane* reaffirms *Alcoa* as to when jurisdiction is present, we view this comment as *obiter dicta*.

26. See K. Brewster, *Antitrust and American Business Abroad* (1958), p. 446.

27. *Timberlane*, 549 F.2d at 613.

28. While the *Timberlane* Court appears to have grafted the adjective "substantial" to Learned Hand's intended effect test, the *Alcoa* standard emerges from *Timberlane* essentially intact.

29. While the District Court engaged in this analysis in connection with his decision to enter default judgment, we find that the Court's decision to exercise its jurisdictional authority is implicit in that order.

30. Indeed, it was asserted by counsel for Westinghouse during oral argument that one defaulter simply tore up the complaint in the presence of the process server.

Court should not exercise its jurisdiction. They have chosen instead to present their entire case through surrogates. Wholly owned subsidiaries of several defaulters have challenged the appropriateness of the injunctions,[31] and shockingly to us, the governments of the defaulters have subserviently presented for them their case against the exercise of jurisdiction. If this Court were to remand the matter for further consideration of the jurisdictional question, the District Court would be placed in the impossible position of having to make specific findings with the defaulters refusing to appear and participate in discovery. We find little value in such an exercise.

We conclude that given the posture of this case, and the circumstances before the District Court, the Judge did not abuse his discretion in proceeding to exercise his jurisdiction. We therefore decline to remand the case to the District Court as requested by the amici curiae.

## II. THE DEFAULT JUDGMENT

■ In both the appeal of the injunctions and the appeal of the District Court's decision to proceed to a damage hearing, the appellants vigorously attack the entry of default judgment as an abuse of discretion. They contend the abuse of discretion arises from the Court's failure to follow *Frow v. De La Vega, supra.* If the default judgment was erroneously entered, they argue, the subsequent injunctions to preserve the viability of that judgment, and the decision

to proceed to damages, must also be erroneous. Since the applicability of *Frow* to this case is the cornerstone of both appeals, we now address that question. Our conclusion is that *Frow* does not control this case and that the District Court's entry of default judgment against the defaulters was entirely proper.[32]

The complaint in *Frow* alleged a conspiracy by Frow and others to defraud the plaintiff, De La Vega, of title to a tract of land. Frow failed to appear and default judgment was entered against him. After the other appearing defendants were exonerated, Frow made an appearance and unsuccessfully petitioned the court to vacate the judgment "pro confesso" entered against him. Frow argued that the two decrees were obviously inconsistent. The answering defendants had prevailed on the merits and cleared title to the land in question. Yet, a contrary decree existed as to Frow. He was held—"pro confesso"—to have fraudulently obtained title to the land as alleged by the plaintiff. Thus, upon appeal, the Supreme Court was faced with inconsistent decisions as to title to a single tract of land. Mr. Justice Bradley properly declared this result "absurd, as well as unauthorized by law." 82 U.S. at 554.

The complaint in *Frow* alleged a "joint" fraud. As the Court in *Frow* discovered, and recent commentators have correctly noted, if "the alleged liability is joint, a default judgment should not be entered

**31.** One such subsidiary, Atlas Alloys, Inc., is not even a party in this action.

**32.** Westinghouse argues that only the defaulters against whom the default judgment has been entered have standing to attack that judgment. The appellants claim standing as parties to this action, who are adversely affected by the Court's entry of judgment against the defaulters. Atlas Alloys and Rio Algom Corporation claim that they have standing to attack the District Court's injunctions because their assets were affected by those orders. Also, these American subsidiaries were found to be "assets" of the defaulters and thus subject to execution on the judgment, after damages are determined. We find these sufficient allegations of "injury in fact" to confer standing on Atlas

Alloys and Rio Algom Corporation. *Sierra Club v. Morton*, 405 U.S. 727, 733, 92 S.Ct. 1361, 1365, 31 L.Ed.2d 636 (1972); *United States v. SCRAP*, 412 U.S. 669, 686, 93 S.Ct. 2405, 2415, 37 L.Ed.2d 254 (1973). As to the second appeal, the answering defendants assert that potential prejudice to them resulting from a damage hearing prior to trial on the merits is sufficient to confer standing. For the reasons set forth in Part IV of this opinion, we find that the potential economic harm to these defendants should the Court proceed to damages is sufficient to confer standing. *See Data Processing Service v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) and *Barlow v. Collins*, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970).

against a defaulting defendant until all of the defendants have defaulted" or there has been "an adjudication as to the liability of the non-defaulting defendants." [33]

■ Here, Westinghouse argues that *Frow* does not preclude entry of a default judgment against more than one but less than all of the defendants when liability is joint and several. The appellants respond to this argument by relying on *Frow* as *stare decisis*, and raising the spectre of inconsistent adjudications. We find that Westinghouse's view is the correct one based upon our analysis of joint and several liability and our conclusion that there is little possibility of inconsistent adjudications of liability.[34]

■ Joint or common liability arises when a tortious act is committed by several persons acting in concert. It means that each tortfeasor is entirely responsible for the damage resulting from that concerted conduct.[35] A successful plaintiff may look to any one of the defendants for full satisfaction of a damage award. Several or independent liability, on the other hand, arises when one defendant[36] is found to have committed a tort without the aid of other defendants. A finding of liability as to one defendant is consistent with a finding of no liability as to the others, so long as there is no relationship between the parties requiring vicarious liability.

■ Anti-trust liability under Section 1 of the Sherman Act is joint and several.[37] When these two distinct potentials for liability coexist in a single claim, there is a tension. The present case exemplifies that tension. If all twenty-nine of the defendants were found culpable of price-fixing, Westinghouse could seek to satisfy its judgment and damages award against all the defendants, or single out one price-fixer. But at the same time, only a small group of the defendants might be found to have conspired to fix the price of uranium, and the remaining defendants would be exonerated. Such a finding of liability as to nine defendants is not inconsistent with a finding of no liability as to the other twenty, because liability is potentially "several" as well as "joint".

*Frow* involved a claim of a joint tort to defraud the plaintiff of title to a res. To the extent that it holds that there cannot be inconsistent adjudications as to joint liability[38] or as to a single res in controversy[39] this ancient equity case remains good law. But to apply *Frow* to a claim of joint and several liability is to apply that venerable case to a context for which it was never intended,[40] and ignores the several or independent aspects of the claim set forth in this complaint. The result in *Frow* was clearly mandated by the Court's desire to avoid logically inconsistent adjudications as to liability. However, when different results as to different parties are not logically inconsistent or contradictory, the rationale

---

**33.** J. Moore, Federal Practice ¶ 55.06, at 55–81; *See also* 10 Wright and Miller, Federal Practice and Procedure, § 2690, at 289–90.

**34.** See discussion on damages, Part IV, *infra*.

**35.** Prosser, 4th Ed. (1971) § 46. *See Miller v. Singer*, 131 Colo. 112, 279 P.2d 846 (Colo.1955).

**36.** In a conspiracy case, one group of two or more defendants.

**37.** *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434 (3rd Cir. 1977).

**38.** *Schofield v. Palmer*, 134 F. 753 (W.D.Va. 1904); *Mirabile v. Smith*, 119 Cal.App.2d 685, 260 P.2d 179, 181 (1953).

**39.** See e. g. *Barnes v. Boyd*, 8 F.Supp. 584 (S.D.W.Va.), aff'd 73 F.2d 910 (4th Cir. 1934),

cert. denied, 294 U.S. 723, 55 S.Ct. 550, 79 L.Ed. 1254 (1935); *Exquisite Form Industries, Inc. v. Exquisite Fabrics of London*, 378 F.Supp. 403 (S.D.N.Y.1974); *Davis v. National Mortgage Corp.*, 349 F.2d 175 (2d Cir. 1965); *McLeod v. Palmer*, 96 Kan. 159, 150 P. 535 (1915).

**40.** The District Court considered this distinction and rejected it. The Court's Memorandum Opinion of January 3, 1979 found that both *Frow* and the present action fall within the category of a "joint tort" to which there is joint and several liability. We do not view *Frow* as broadly. We view *Frow* as limited to exclusively joint liability claims or situations where there is a single res in controversy.

for the *Frow* rule is lacking.[41] Such is this case involving joint and several liability.[42]

In *International Controls Corp. v. Vesco*, 535 F.2d 742 (2nd Cir. 1976), the Court reached a similar conclusion. In that case ICC filed a complaint alleging that Vesco and others had violated their fiduciary duties and conspired to violate the anti-fraud provisions of the Securities Exchange Act of 1934. Vesco defaulted, while the other defendants contested the allegations of the complaint. ICC attempted to satisfy the default judgment with the assets of Vesco & Co., Inc. The Company sought to overturn the default judgment on the basis of *Frow*. The Second Circuit disposed of that argument in a footnote stating:

> We think it most unlikely that *Frow* retains any force subsequent to the adoption of Rule 54(b). In any event, at most *Frow* controls in situations where the liability of one defendant necessarily depends upon the liability of the others. 535 F.2d 742, 746–47 n.4.

We conclude that *Frow* does not preclude the entry of default judgment against a group of nine defaulters prior to adjudication on the merits as to the remaining defendants, where liability is joint and several.

Once *Frow* is placed in proper perspective, the entry of default judgment can be viewed as a simple exercise in the procedures set out in Rules 54 and 55 of the Federal Rules of Civil Procedure. Rule 55(b) permits the Court to enter default judgment against any party, with notice of the pending application for judgment, who fails to appear and respond to the allegations of the complaint. Rule 54 permits

final judgment "as to one or more but fewer than all of the claims or parties upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment."[43] The District Court, after waiting two years for the defaulters to appear, made the determination to enter judgment against the defaulters and proceed to the merits of the controversy. Such a determination will only be set aside for an abuse of discretion. *Bogosian v. Gulf Oil Corp., supra*, 561 F.2d 434. We find no abuse of discretion. To the contrary, the Court's determination to enter judgment against the nine defaulters is in accordance with the procedures set forth in the Federal Rules.

The District Court also suggested that Rule 37(d) F.R.C.P. supports entry of default judgment in this case. That Rule authorizes the imposition of sanctions against parties who refuse to participate in discovery. The Rule makes no mention of default judgment. However, default judgments have been sustained as a valid exercise of the District Court's power under Rule 37(d). *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 643, 96 S.Ct. 2778, 2781, 49 L.Ed.2d 747 (1977). Because we find that Rules 54(b) and 55(b) permit entry of default judgment in this case, we find it unnecessary to comment on the appropriateness of a default judgment under Rule 37(d).

## III. THE INJUNCTIONS

Atlas Alloys, Inc. and Rio Algom Corporation appeal the orders enjoining the defaulting defendants from transferring assets out of the United States without prior

---

**41.** During oral argument, counsel for Gulf conceded that there are many situations in which different results are reached on a single claim involving multiple parties. Some examples are: when one defendant settles a claim while the other defendant goes on to prevail on the merits; when one defendant accepts an adverse judgment while the other successfully appeals; and when a jury finds two defendants guilty of conspiring yet absolves the remaining defendants. These examples are cited simply to illustrate that all different results are not necessarily logically inconsistent or absurd.

**42.** We do perceive, however, a real possibility of inconsistent determinations as to damages. That possibility is discussed in part IV *infra*.

**43.** Rule 54(b) also requires that "more than one claim for relief [be] presented in an action." We find that the several and independent quality of this claim satisfies that requirement.

approval of the Court.[44] Appellants argue that the injunctions are erroneous because they are bottomed on an erroneously entered default judgment; that the District Court lacked the power to enter the injunctions; and assuming the Court was empowered to enter the injunctions, they are tantamount to an attachment of assets and, therefore, are an abuse of discretion.

We reject appellants' argument that the injunctions must be overturned because they are predicated on an erroneous default judgment. That argument assumes that *Frow v. De La Vega* prohibits the entry of default judgment in this case. Our prior discussion of the inapplicability of *Frow* to this action resolves that question and needs no further repetition here. Indeed, the starting point of our analysis is that the District Court's use of injunctive power was pursuant to a valid default judgment.

■ Appellants argue that the District Court lacked the power to enter the injunctions. Appellants' contention is that absent a final default judgment there are only three sources upon which these injunctions could be predicated: Rules 64 and 65 F.R. C.P. and the inherent equity powers of the district court. Appellants insist that none of those sources permit the Court to enter these injunctions.[45] Westinghouse relies primarily on general equity powers in its argument in support of the injunctions. We find that both the inherent equity powers of Federal Courts and the All Writs Act, 28 U.S.C. § 1651(a) confer upon the district court power to enjoin the transfer of assets in this case.

The situation confronting the district court was extraordinary. In order to avoid execution on the default judgment, Rio Algom Limited instructed its American subsidiaries to transfer their assets to Canada. The defaulting defendant circumvented and even ignored the district court's restraining order in an effort to transfer funds out of the United States. Had the Court not exercised its injunctive powers the default judgment would have been rendered meaningless.

■ Federal Courts are empowered to restrain the removal of assets from the United States through injunctive relief. *United States v. First National City Bank*, 379 U.S. 378, 85 S.Ct. 528, 13 L.Ed.2d 1365 (1965). *See SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082 (2d Cir. 1972). Such equitable relief is particularly appropriate when a default judgment has been entered. *International Controls Corp. v. Vesco*, 490 F.2d 1334, 1347 (2d Cir. 1974). Since a preliminary injunction seeks to preserve the *status quo ante litem*, (*Seagrams Distillers Corp. v. New Cut Rate Liquors*, 221 F.2d 815 (7th Cir. 1955)), it is also an appropriate means of maintaining the status quo as of the time the default judgment was entered. Given our conclusion that the default judgment was a proper exercise of the district court's discretion, it seems evident that the Court was empowered to enter all equitable orders necessary to preserve that judgment.

We also find support for the district court's authority to enter these injunctions in the All Writs Act, 28 U.S.C. § 1651(a).[46] That Act simply empowers Federal Courts to enter such writs as are necessary to preserve the jurisdiction of the Court. In the anti-trust context, the Act has been recognized as an effective tool for preserving the status quo. *F. T. C. v. Dean Foods Co.*, 384 U.S. 597, 604, 86 S.Ct. 1738, 1742, 16 L.Ed.2d 802 (1966). The Act has been relied on for the entry of injunctive relief when necessary to preserve the jurisdiction of the district court over a Sherman Act claim. *United States v. Western Pa. Sand and Gravel Association*, 114 F.Supp. 158 (W.D.

**44.** For a discussion of these appellants' standing to contest the injunctions, see note 32, *supra*.

**45.** To a large extent, that argument is undermined by our conclusion that the default judgment was proper. Nevertheless, we address this issue.

**46.** The All Writs Act provides: The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.

Pa.1953).[47] If the defaulting corporations continued to transfer their assets out of the United States, the district court would be unable to enter any effective judgment as to damages. While the Court would not technically be robbed of subject matter jurisdiction, the Court's default judgment would be rendered meaningless and the Court would be powerless to enter any effective relief as to the defaulters. Confronted with such a situation, the District Court was empowered to enter any injunctive relief necessary to preserve its jurisdiction.

We note that in *De Beers Mines Ltd. v. United States*, 325 U.S. 212, 65 S.Ct. 1130, 89 L.Ed. 1566 (1945), the Court overturned a preliminary injunction against the removal of assets which had been entered pursuant to the All Writs Act. In *De Beers*, as in the present case, the injunction was entered to prevent defendants from removing assets out of the United States, thereby avoiding enforcement of a final decree of the Court. In *De Beers*, however, there was no judgment against the parties who were enjoined. The motion for preliminary injunction was filed with the complaint and was supported only by the unproven allegations in the complaint and an affidavit stating that the defendants "could quickly withdraw their assets from the United States." *Id.* at 215, 65 S.Ct. at 1132. In the present case the defendants have confessed to the allegations of the complaint by their failure to contest those allegations, and a valid judgment has been entered against them. Indeed, the Court in *De Beers* suggested that had the injunction been pursuant to a final decree it would have been sustained. *Id.* at 220, 65 S.Ct. at 1134.

The All Writs Act empowers Federal Courts to protect their jurisdiction. The injunction in *De Beers* did not serve to preserve the Court's jurisdiction and was therefore not within the ambit of the Act. The injunctions in the present case, however, aid the Court in the exercise of its powers; i. e., in enforcing its judgment. For that reason, *De Beers* does not preclude use of the All Writs Act powers in this case.

Rio Algom Corporation and Atlas Alloys, Inc. argue that assuming the Court was empowered to enter the injunctions in this case, the Court abused its discretion in doing so. The enjoining of transfers of assets was, in effect, an attachment. An attachment or sequestration of assets prior to final judgment, they argue, is simply an abuse of the Court's equity powers.

The cases relied upon by appellants all involve a prejudgment sequestration of assets [48] or diversity claims in which state attachment procedures govern.[49] We find those cases inapposite. Here there has been a judgment entered against the defendants whose assets have been sequestered. In that situation, courts have permitted equitable restraints on assets because the default serves as an admission to the allegations in the complaint. *See ICC v. Vesco, supra*, 490 F.2d 1334. When a violation of law is present, Courts have considerable discretion in fashioning equitable orders to prevent the removal of assets from the United States. *See SEC v. Manor Nursing Centers, Inc., supra*, 458 F.2d 1082.

▮ The district court's exercise of discretion in entering a preliminary injunction is measured against four prerequisites:

---

**47.** In that case, the United States brought an action against several corporations to enjoin violations of §§ 1–7 of the Sherman Act. Pursuant to a consent decree, a preliminary injunction was entered pending final adjudication on the merits. In the interim, one of the defendants sought to dissolve the corporate entity, and the government moved for a preliminary injunction restraining further attempts at dissolution. The district court concluded that the All Writs Act authorized the entry of the injunction to preserve the court's jurisdiction over the matter, and entered the injunction.

**48.** *De Beers Mines v. United States, supra*, 325 U.S. 212, 65 S.Ct. 1130, 89 L.Ed. 1566. We note that *De Beers* has not been applied when there is "property which would be the subject of the provisions of any final decree." *United States v. First National City Bank*, 379 U.S. 378, 385, 85 S.Ct. 528, 532, 13 L.Ed.2d 1365 (1965). Given a valid default judgment in a claim for damages, we are approaching that precise situation in this case.

**49.** *Baxter v. United Forest Products Co.*, 406 F.2d 1120 (8th Cir. 1969).

(1) The plaintiffs have no adequate remedy at law and will be irreparably harmed if the injunction does not issue;

(2) The threatened injury to the plaintiffs outweighs the threatened harm the injunction may inflict on the defendant;

(3) The plaintiffs have at least a reasonable likelihood of success on the merits; and

(4) The granting of a preliminary injunction will not disserve the public interest. *Fox Valley Harvestore v. A. O. Smith Harvestore Products, Inc.*, 545 F.2d 1096 (7th Cir. 1976).

We find each of those prerequisites met in this case.

■ There is no remedy at law which could effectively prevent the removal of the defaulter's assets from the jurisdiction of the United States Courts. Indeed, defaulters' conduct is particularly suited for equitable remedies. With regard to the requisite threat of irreparable harm, it is evident that without the Court's use of injunctive powers the plaintiffs' ability to satisfy the judgment would be seriously jeopardized.

The Court's injunctive orders do not place an onerous burden on the defaulting defendants. The Court's orders simply require prior approval of transfers of funds and permits transactions in the ordinary course of business. However, the threatened injury to plaintiff from the continued withdrawal of assets is substantial. We find that the scale tips in favor of the injunctions.

Since a judgment of liability has been entered against the defaulting defendants, there is clearly more than a reasonable likelihood of success on the merits. While it is conceivable that the defendants might prevail on the merits in the final analysis,[50] plaintiff has a substantial likelihood of success against the defaulters at this posture of the litigation.

Finally, the injunctions of the District Court do not disserve the public interest. To the contrary, the entry of these injunctions serves a strong national interest in effective and meaningful enforcement of the American anti-trust laws. *See Perma Muffler v. International Parts Corporation*, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968). As the District Court correctly pointed out, the pattern of conduct engaged in by the defaulters "can only disserve the public interest" and the public interest is best served by "a firm insistence that they [the defaulters] respond to the orderly processes, the lawful processes, yes, the due process of his Court." (Order of Mar. 27, 1979)

We conclude that the district court did not abuse its discretion in enjoining the transfer of funds out of the United States and that each injunction should be and hereby is affirmed.

## IV. A HEARING ON DAMAGES

■ The appellants claim that they will be severely prejudiced by a hearing on damages against the defaulters. The appellants have difficulty in articulating precisely how they would be prejudiced. It is not disputed that a determination as to damages against the defaulters would have no collateral estoppel or res judicata effect.[51] Nevertheless, appellants suggest there would be a psychological precedent which they would have difficulty overcoming should damages be determined. Appellants also point to the questionable validity of Westinghouse's claim under the *Illinois*

---

**50.** Westinghouse argues "the default disposes of any question of likelihood of success." We disagree. It is possible that the defendants could appear, successfully move to vacate the default, and ultimately prevail on the merits. Also, the district court could find that the complaint fails to state a claim. In that event, the default judgment would be subject to similar attack. See part IV *infra*.

**51.** See *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 327 n.7, 99 S.Ct. 645, 649, 58 L.Ed.2d 785 (1978); *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 329, 91 S.Ct. 1434, 1443, 28 L.Ed.2d 788 (1971).

*Brick*[52] Doctrine as a basis for postponing a damages hearing. In *Illinois Brick* the Supreme Court held that only direct purchasers could maintain an action for damages against alleged price-fixers under section four of the Clayton Act.

We perceive the problems in proceeding to damages in terms of possible inconsistency and judicial economy, rather than actual prejudice. The possible inconsistency is that there could be two distinct damages awards on a single claim involving joint and several liability. Considerations of judicial economy are relevant because if the appellants are correct in their analysis of the applicability of *Illinois Brick* to this case, a damages hearing prior to resolution of that issue could prove to be a useless exercise.

If damages are entered against the defaulters now, and Westinghouse subsequently prevails on the merits against the answering defendants, damages would then have to be determined as to the answering defendants. The possibility of two distinct determinations as to the damages arising out of a single price-fixing claim is, indeed, an inconsistency. Just as the several or independent nature of plaintiff's claim permits different findings as to liability of individual defendants, the joint nature of plaintiffs' claim prohibits different findings as to damages against all defendants. While our research has uncovered situations in which inconsistent verdicts as to damages have resulted on a claim involving joint liability, the wholly unsatisfactory manner in which those cases have been handled convinces us that such a result is erroneous and must be avoided.[53]

It is suggested by Westinghouse that "judgments in differing amounts" are permissible in a joint and several claim. Yet, this argument ignores the fact that those defendants ultimately found liable are jointly liable for the entire damage award, and that Westinghouse could look to any one defendant for full satisfaction of *the* damage award.

Westinghouse may not split its claim and proceed to damages against the defaulters and then proceed to a separate damages award against the answering defendants. Westinghouse has chosen to initiate a single claim involving joint liability. That claim must be concluded just as it began—as one action.[54]

Thus, while Westinghouse has secured a valid default judgment as to the defaulters' liability, a damages hearing may not be held until the liability of each defendant has been resolved. Should Westinghouse decide to pursue its claim against the answering defendants, a determination of damages as to the defaulters will have to be stayed until the entire claim is resolved. In the event that Westinghouse is successful on the merits, and establishes the anti-trust liability of the answering defendants, then a single damages hearing can be held. That would result in one damages award recoverable from the answering defendants and defaulters alike, in whatever manner it can be satisfied. However, should Westinghouse elect to dismiss its claim against the answering defendants, with prejudice, the liability of each defendant would be resolved and Westinghouse could proceed to a determination of damages as to the defaulters immediately.

**52.** 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977).

**53.** *See Whitney v. Tuttle*, 62 P.2d 508 (Okl.Sup. Ct.1936) (Court gave plaintiff choice as to which award to take); *Polsey v. Waldorf-Astoria*, 216 App.Div. 86, 214 N.Y.S. 600 (1926) (Court directed that all defendants be held liable for the greater sum); *Southwestern Gas & Electric Co. v. Godfrey*, 178 Ark. 103, 10 S.W.2d 894 (1928) (the lesser award was the maximum recoverable); *Ohio Valley Bank v. Greenbaum Sons Bank & Trust Co.*, 11 F.2d 87 (4th Cir. 1926) (allowing both awards to stand).

**54.** Principles of *res judicata* prevent the splitting of a single claim for relief into two separate actions. *McConnell v. Travelers Indemnity Co.*, 346 F.2d 219, 222 (5th Cir. 1965); *White v. Sinclair Prairie Oil Co.*, 139 F.2d 103 (10th Cir. 1943). Also, actions involving joint obligations at common law could not be split. Once the plaintiff secured a judgment against one or more defendants, he could not proceed against the remaining defendant. *Davidson v. Harmon*, 65 Minn. 402, 67 N.W. 1015 (1896); *Coles v. McKenna*, 80 N.J.L. 48, 76 A. 344 (1910).

There is another consideration which compels a stay of any damages determination if plaintiff elects not to dismiss the answering defendants. These defendants maintain that Westinghouse may not bring this claim for price fixing, as it is not a direct purchaser of uranium as is required by *Illinois Brick v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). That case and its progeny place limitations on the circumstances which give rise to a price-fixing claim for damages under section four of the Clayton Act.[55] The applicability of *Illinois Brick* to this claim is not an issue before this Court and we decline to pass on that question at this juncture. That issue is presently pending before the District Court. We simply point out that as long as the legal sufficiency of this claim remains at issue, the interests of judicial economy dictate that a damage hearing be held in abeyance.[56]

## V. CONCLUSION

Section 1292(b) of the Judicial Code provides appellate courts with a flexible tool for interlocutory review of complex and controlling questions of law. Interlocutory review is permitted to assure orderly and efficient administration of complex cases.[57] Our decision today should be viewed in that context. Our conclusion is that *Frow* does not control this case and that the entry of default judgment was not an abuse of discretion. Nevertheless, the question of damages must await resolution of the issue of liability as to all parties. As a practical matter, Westinghouse must elect whether to abandon its claim against the answering parties and pursue the question of damages solely against the defaulters, or proceed to the merits on the entire claim. Should

Westinghouse choose the latter course, the judgment against the defaulters will remain interlocutory until a judgment on the merits is reached.

Our result today is mandated by the nature of joint and several liability.[58] While the liability of each defendant presents separate and distinct issues entirely independent of each other, there is a single unified damage to the plaintiff. The defaulting defendants have confessed to the Westinghouse allegations by their refusal to appear. The defaulters may have to accept full responsibility for the damage ultimately proven by Westinghouse as a result of that default.

The cause is REMANDED to the District Court to proceed in accordance with the views herein expressed.

SWYGERT, Circuit Judge, dissenting in part and concurring in part.

With one important exception, I concur in all respects in the result reached by Judge Campbell in these appeals; however, my concurrence as to the hearing on damages as well as the issuing of the injunction is based on reasons different from those advanced by him.

In my view *Frow v. De La Vega* controls this case. The trial judge's analysis of that decision as being apposite to the case at bar is, in my judgment, irrefutable. *In re Uranium Antitrust Litigation*, 473 F.Supp. 382, 385–88 (N.D.Ill.1979). I do disagree, however, with his further analysis that Rule 54(b), Federal Rules of Civil Procedure, may be used to circumvent the application of *Frow* so as to permit the entry of a judgment against the defaulting defendants and

**55.** *Illinois Brick* was not decided on the basis of standing. It is a substantive analysis of what conduct runs afoul of section four. *See Illinois Brick*, 431 U.S. at 728, n.7, 97 S.Ct. at 2065; *Mid-West Paper Products Co. v. Continental Group*, 596 F.2d 573, 592 (3rd Cir. 1979).

**56.** In the event that Westinghouse elects to dismiss its claim against the answering defendants, the motions to dismiss filed by those defendants would be moot. In that event, the

District Court could proceed to damages as to the defaulters.

**57.** *See Hadjipateras v. Pacifica S.A.*, 290 F.2d 697, 703 (5th Cir. 1961).

**58.** We note that some commentators suggest that joint and several liability is inappropriate for price-fixing conspiracy claims. Izard & Miller, *High Price-Fixing Awards Require Abolition of Joint, Several Liability*, 1 Nat.L.J. 50 (Aug. 27, 1979).

a concomitant assessment of damages while leaving the liability-damage question as to the remaining defendants for a future trial on the merits.

Rule 54(b) was designed to regulate the appealability of claims, multiple as to parties or claims or both. It is a procedural device to avoid the final judgment rule. Its use was never intended to, nor could it, formulate or modify substantive law. The Rules Enabling Act, 28 U.S.C. § 2072, provides that the Federal Rules of Civil Procedure "shall not abridge, enlarge or modify any substantive right . . .." *Frow* speaks to substantive rights: a claim of joint tort liability may not be split or severed among defendants so as to permit recovery against some, but not all, the defendants who have acted in combination to cause the tort.

The tort alleged in this action stems from the asserted violation of the antitrust laws. Westinghouse is the sole plaintiff, and it asserts a single claim against twenty-nine defendants. Damages, whatever the extent, can flow only from the single injury which was assertedly caused by all or some of the defendants acting jointly. Those damages after proper assessment may be collected from all or any of the defendants found liable, on a selective basis at the will of Westinghouse. This eventuality, that is, collectibility, is what makes the claim for damages "joint and several." The claim is not several in relation to the issue of liability-damage for the single tort (injury) caused by the joint conspiratorial aims and acts of the defendants. For these reasons, the total damages, if any, owing to Westinghouse are identical conceptually with the title to the res in *Frow*.

Insofar as the impending damage hearing is concerned, my reasoning leads practically to a result identical to that reached by my Brothers. Westinghouse, unable at this point to obtain a judgment, must await trial of the appearing defendants before it can have a hearing on damages. Alternatively, if Westinghouse elects to dismiss its claim against the appearing defendants, a default judgment can be entered and the hearing to assess damages may be had immediately upon the dismissal.

In respect to the injunction, I again part company to a large extent with the reasoning of Judge Campbell. Given the applicability of *Frow* so as to bar the entry of a judgment against the defaulting defendants at this time, any reliance on the default judgment to authorize the injunction is misplaced. The entry of a default under Rule 55(a) and the potentiality of a binding default judgment under Rule 55(b) provide a solid ground for the application of both the All Writs Act and the inherent equity powers of the Federal Courts so as to give the trial court the power to enjoin the removal of assets from the United States, which may be subject to a writ of execution under the default judgment if and when entered.