**UNITED STATES of America**

v.

**Stefan E. BRODIE, Donald B. Brodie, James E. Sabzali, Bro–Tech Corporation d/b/a "the Purolite Company"**

**No. 00CR629.**

United States District Court, E.D. Pennsylvania.

Oct. 23, 2001.

Gregory B. Craig, Williams and Connolly, Washington, DC, for Stefan E. Brodie, Defendants.

Paul R. Rosen, Spector, Gadon & Rosen, Philadelphia, Steven Kimelman, Scott Peeler, Williams Connelly Arent Fox, New York, NY, for Donald E. Brodie, Defendants.

Robert E. Welsh, Jr., Catherine M. Recker, Weish & Recker, Phila, for James C. Sabzali, defendent.

Gregory P. Miller, Miller, Alfano & Raspanti, P.C., Kevin Raphael, Miller Alfano & Raspanit, PC, Phila, for John H. Dolan, Defendants.

Paul R. Rosen, Spector, Gadon & Rosen, Edward S.G. Dennis, Jr., Morgan, Lewis & Bockius, Phila, for Bro–Tech Corporation The Purolite Company, Defendants.

## MEMORANDUM AND ORDER

McLAUGHLIN, District Judge.

The indictment in this case charges defendants with conspiracy to violate the Trading with the Enemy Act ("TWEA") and the Cuban Assets Control Regulations ("CACRs"). Three of the defendants— Bro–Tech Corporation, Donald Brodie, and James Sabzali—are also charged with substantive violations of TWEA and the CACRs. The alleged crimes involve sales of ion exchange resins to Cuba through intermediaries.

The Court decides here two motions to dismiss most counts of the indictment on one of the following grounds: the foreign sovereign compulsion defense; lack of jurisdiction; or principles of international comity. The Court will deny the motions.

The defendants' foreign sovereign compulsion and international comity arguments depend on the existence of certain laws in Canada, the United Kingdom, and the European Union that are known as "blocking statutes." Canada, the United Kingdom, and the European Union disagree with the decision of the legislative and executive branches of the United States to bar trade with Cuba. These foreign jurisdictions, therefore, enacted laws to "block" the impact of the CACRs in their countries. Generally, they try to do that by prohibiting corporations and individuals from not trading with Cuba in order to comply with the CACRs. These laws do not order people or corporations to trade with Cuba; companies can trade or not trade with Cuba for any reason at all, except in order to comply with the CACRs.

Assuming that the foreign sovereign compulsion doctrine applies in the criminal context, it is not applicable here. Blocking statutes did not require the defendants to sell product to Cuba—the crime charged in the indictment. Nor does there appear to be a realistic possibility of prosecution under these laws. Moreover, the affidavits of the experts on the foreign laws submitted by the defendants do not establish that these laws would apply to these defendants in connection with the conduct alleged in the indictment. Many of these same considerations also require denial of the international comity motion. Finally, as to jurisdiction, TWEA and the CACRs were intended to cover extraterritorial conduct, and such conduct is likely to have effects in the United States. The Court, therefore, has jurisdiction.

## I. *Nature of Conduct Charged in the Indictment*

On October 5, 2000, a federal grand jury returned an indictment against Stefan Brodie, Donald Brodie, James E. Sabzali, and the Bro–Tech Corporation, d/b/a the "Purolite Company." The indictment charges all of the defendants with violating 18 U.S.C. § 371 by conspiring to engage in transactions which contravene the Trading with the Enemy Act ("TWEA"), 50 U.S.C.App. § 5(b) (1990), and the Cuban Assets Control Regulations ("CACRs"), 31 C.F.R. § 515 (1963), promulgated under TWEA. Defendants Donald Brodie, James Sabzali, and Bro–Tech are also charged with 75 counts of TWEA violations. Defendant Bro–Tech Corporation ("Bro–Tech") is alleged to have received payment for transactions in which it shipped ion exchange resins ("IERs") to Cuba through intermediary entities.

Bro–Tech, incorporated in Delaware and headquartered in Bala Cynwyd, Pennsylvania, manufactures IERs and trades under the name "The Purolite Company." *See* Indictment, Count 1 ¶ 3. Stefan and Donald Brodie are the officers and owners of Bro–Tech. James Sabzali was the Canadian Sales Manager and later North American Director of Marketing for Bro–Tech. *See id.*, Count 1, ¶¶ 5–6 (Brodies), 7 (Sabzali).

Facts relevant to the motions decided here divide into three primary time periods. The first is from 1992 until April 1996, when James Sabzali served as the Canadian Sales Manager in Bro–Tech's Canadian sales office, Purolite Canada. He is charged with negotiating and arranging sales to Cuba while there, travelling to Cuba, and receiving reimbursement from the corporation for that travel. *See* Indictment, Count 1 ¶¶ 20, 21, 25, 26, and 34; Overt Acts ¶¶ 1–38; and Counts 2–36.

The second period lasted from April to September 1996. During this period, James Sabzali lived in the United States, and worked out of Bro–Tech's Pennsylvania headquarters. He is charged with negotiating and arranging further sales to Cuba during this period. *See* Indictment, Count 1, ¶ 7 & Overt Acts ¶¶ 39–42; Counts 37–40.

The third period is after September 1996. At that time, James Sabzali worked in the United States, but was replaced as Canadian Sales Manager by another employee at Purolite Canada.[1] He is charged, during this period, with approving and causing sales to Cuba, and reimbursing travel expenses for employees to Cuba. *See* Indictment, Count 1, Overt Acts ¶¶ 43–77; Counts 41, 43–77.

The indictment charges that Stefan Brodie, on or about April 7, 1993, purportedly sent a memorandum to Bro–Tech's sales offices instructing that "[n]o shipment of Purolite merchandise [wa]s to be shipped to, redirected to, or trans-shipped to Cuba." Indictment, Count 1, ¶ 16. Stefan Brodie is charged with subsequently giving orders that future sales to Cuba should be treated on documents as originating from Purolite International Limited—a U.K. affiliate of Bro–Tech—even though the IERs would be sold by Bro–Tech.[2] *See* Indictment, Count 1, ¶ 18.

According to the indictment, product was shipped both from Bro–Tech's U.S. manufacturing facility in Philadelphia and from Purolite International in the United Kingdom. *See* Count 1, ¶ 19, 24, 28; and Counts 2–29; 33–41 (Philadelphia); Count 1, ¶ 27 and 32; and Counts 31, 32, 43–77 (United Kingdom). The indictment names a number of intermediaries allegedly used to transport the product to Cuba. *See* Indictment, Count 1, ¶¶ 10, 13–15.

Donald Brodie's liability arises from his "causing" and approving the Cuban sales, and reimbursing employees for travel to Cuba, while in the United States. *See*

---

**1.** Claude Gauthier, an unindicted co-conspirator, took over James Sabzali's position as Canadian Sales Manager in 1996. The indictment notes that a person known only to the Grand Jury, but identified in later filings as Mr. Gauthier, negotiated and arranged transactions involving the sale of Bro–Tech products to Cuba, along with defendant James Sabzali. *See* Indictment, Count 1, ¶¶ 33–35; Def. Compulsion Brief at 31; Hearing Transcript on Foreign Sovereign Compulsion, Jurisdiction, and Comity Motions, at 23, 59.

**2.** Purolite International Limited and Bro–Tech Limited are U.K. companies affiliated with Bro–Tech Corporation. Bro–Tech Limited is jointly owned by Donald Brodie, Stefan Brodie, and Bro–Tech Corporation. Bro–Tech Limited is the 95% owner of Purolite International Limited. *See* Indictment, Count 1, ¶¶ 4–6.

Indictment, Count 1, ¶¶ 21, 26, 35, Overt Acts ¶¶ 4–77; Counts 2–41, 43–77.

## II. *Nature of Motions to Dismiss*

The Court decides in this memorandum two motions to dismiss various counts of the indictment on the grounds that: (1) the defendants' conduct was compelled by foreign law; (2) the Court lacks jurisdiction over certain counts because they involve conduct that occurred outside the United States; and (3) even if the Court has jurisdiction, it should decline to exercise it in deference to principles of international comity.

## III. *Canada, United Kingdom, and European Union "Blocking Statutes"*

Underpinning the defendants' foreign sovereign compulsion and comity arguments is the existence of so-called "blocking statutes" passed by Canada, the United Kingdom, and the European Union. The defendants submitted the affidavits of J. Scott Fairley, a Canadian lawyer, and Christopher John Greenwood, a U.K. lawyer and professor, describing the laws in their respective countries.

### A. *Canada*

In 1984, Canada enacted the Foreign Extraterritorial Measures Act ("FEMA") to authorize the Attorney General of Canada to order Canadian persons not to comply with designated measures of a foreign state. In 1992, the Attorney General of Canada issued an order (the "1992 Canadian Order") under FEMA that named the CACRs as one of the designated measures. That order prohibited Canadian corporations from complying with the CACRs or with instructions pursuant to the CACRs (the "prohibition prong"). *See* Fairley Aff. ¶¶ 5, 9, 11, and App. 6.

In 1996, the Attorney General amended the 1992 Canadian Order. This amendment (the "1996 Amended Canadian Order") expanded the application of the prohibition prong from Canadian corporations to Canadian corporate directors, officers, managers and "employees in a position of authority." *Id.* ¶ 12.

Since 1996, violation of FEMA carries penalties including $150,000 in fines in the case of a corporation and $15,000 for an individual, with additional liability including imprisonment up to a maximum of two years. *See id.* ¶ 6.

The defendants' expert affidavit contains no information regarding enforcement—for example, whether anyone has ever been prosecuted under FEMA or these orders or what evidence would be sufficient to establish a violation of the law.

### B. *United Kingdom*

The United Kingdom enacted in 1980 the Protection of Trading Interests Act ("PTIA"), a general prohibition against certain foreign directives relating to trade with the United Kingdom. The PTIA authorized the Secretary of State to give directions to any person that was both in the United Kingdom and carrying on business there not to comply with certain measures or laws of overseas countries that the United Kingdom considered damaging to its trading interests. *See* Greenwood Aff. ¶¶ 6–7.

The British Secretary of State promulgated a general order in 1992 designating the CACRs as measures to which the PTIA applied. The Secretary also issued General Directions that persons in the United Kingdom shall not comply, or permit compliance, with the CACRs. The maximum penalty for conviction of a violation of the PTIA is an unlimited fine. *See id.* ¶¶ 9, 14–15.

The defendants' expert affidavit on these laws omits any information on whether

prosecutions have ever been brought under the U.K. regime and what evidence is necessary to establish a violation.

## C. *European Union*

On November 22, 1996, the Council of the European Union adopted Council Regulation (EC) No. 2271/96 (hereinafter "EC Regulation"). The EC Regulation prohibits compliance with a list of specified laws, or with orders based on those laws. The list of laws included the CACRs. The EC Regulation applies only to legal persons incorporated within the European Community, residents and nationals of the European Union's member states, persons within the waters and airspace within the European Community, and persons acting in a professional capacity under the jurisdiction or control of a member state. *See* Greenwood Aff. ¶¶ 17–19.

The European Union also adopted a provision enabling member states to adopt criminal sanctions to enforce compliance with the EC Regulation. In response, the United Kingdom adopted a new order (the "1996 U.K. Order") imposing criminal fines on U.K. persons for violation of the EC Regulation. *See id.* ¶ 22.

## IV. *Discussion*

### A. *Standard for Motion to Dismiss an Indictment*

■ Rule 12(b) of the Federal Rules of Criminal Procedure allows defendants to raise defenses in motions to dismiss counts of an indictment if the defenses are capable of determination without the trial of the general issue. *See* Fed.R.Crim.P. 12(b). In analyzing a motion to dismiss an indictment, the Court accepts as true facts alleged in the indictment. *See United*

States v. Besmajian, 910 F.2d 1153, 1154 (3d Cir.1990).

### B. *Foreign Sovereign Compulsion*

Defendants' move this Court to dismiss counts 1–36, 41, and 43–77 of the indictment under the foreign sovereign compulsion doctrine. They allege that the blocking laws that have been enacted by Canada, the United Kingdom, and the European Union criminalize compliance with the CACRs. According to their theory, these blocking laws actually "compel" defendants to trade with Cuba and make impossible compliance with United States laws on trading with Cuba, or with directives based on them.

### 1. *The Doctrine Generally*

Although the foreign sovereign compulsion doctrine has been discussed in several cases, the Court knows of only two decisions in which it has been applied. In *Interamerican Refining Corp. v. Texaco Maracaibo, Inc.*, 307 F.Supp. 1291, 1298 (D.Del.1970), a private, civil antitrust action, the court held that defendants' alleged refusal to deal with a plaintiff was not violative of American antitrust law because the action was compelled by a foreign sovereign. In *Societe Internationale Pour Participations Industrielles et Commerciales v. Rogers*, 357 U.S. 197, 204, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958), the Supreme Court held that a Swiss company's failure to comply with an American discovery order did not warrant dismissal of the complaint, where that failure was based on the Swiss government's position that disclosure of the documents in question would violate Swiss banking secrecy law.

The Third Circuit discussed foreign sovereign compulsion in *Mannington Mills, Inc. v. Congoleum Corp.*, 595 F.2d 1287, 1293 (3d Cir.1979).[3] In that case, Man-

**3.** The Court of Appeals also briefly discussed the doctrine in *In re Japanese Electronic*

nington Mills, an American floor covering manufacturer, brought an antitrust action against Congoleum Corporation, another American manufacturer. Mannington Mills alleged that Congoleum had secured foreign patents fraudulently by an act, which, if committed to secure domestic patents, would have been an antitrust violation. Congoleum moved for dismissal of the case, arguing that the act of state doctrine prevented an American court from inquiring into the validity of a foreign sovereign's act. In describing that doctrine, the Court mentioned and discussed foreign sovereign compulsion as a related concept.[4] *See id.* at 1290, 1292–3.

■ According to the Third Circuit, foreign sovereign compulsion "shields from antitrust liability the acts of parties carried out in obedience to the mandate of a foreign government." *Id.* at 1293. To make out a foreign sovereign compulsion defense, a party must show that: (1) the behavior violating American law was actually compelled by the foreign government; and (2) the foreign order was "basic and fundamental" to the alleged behavior and not just peripheral to the illegal course of conduct. *See id.* at 1294.

The Supreme Court in *Societe Internationale* also required a good faith attempt to comply with American law. The Court held that, where a party finds itself subject to conflicting orders from sovereigns, our courts should be able to require that party to make all efforts to comply with U.S. law.[5] *See Societe Internationale*, 357 U.S. at 205, 78 S.Ct. 1087.

### 2. *Application of the Doctrine to the Indictment*

■ There are several threshold issues that defeat the defendants' arguments. First, the foreign sovereign compulsion doctrine has never been applied in the criminal context. The government argues that it should not be applied here because the executive branch has already made its decision to bring suit. To the extent that the doctrine is based on foreign relations considerations, the fact that a criminal suit has been brought demonstrates the executive branch's determination that the injury to the United States from the alleged conduct outweighs the potential injury to foreign relationships.[6] The Court agrees that if the rationale for the doctrine is deference to the acts of a foreign sovereign, there is no place for the doctrine in a criminal case.

The defendants argue, however, that a second rationale for the sovereign compulsion doctrine is due process. They argue that the doctrine ensures that persons not be held responsible for something they were forced to do. Without holding that the doctrine could never raise due process

*Prods. Antitrust Litig.*, 723 F.2d 238, 315 (3d Cir.1983).

4. The Court held that neither act of state nor foreign sovereign compulsion applied, because the grant of patents was not coercive, and granting patents for floor coverings was not the type of sovereign activity that would concern the executive branch in its conduct of international affairs. *See id.* at 1294.

5. The Supreme Court reasoned that a foreign party subject to compulsion was in an advantageous position to plead with its sovereign for relaxation of penal laws or for adoption of plans to achieve significant compliance with American law. *See Societe Internationale*, 357 U.S. at 205, 78 S.Ct. 1087.

6. Indeed, Canada and the United States have already exchanged a series of diplomatic communications relating to this case. In those communications, which have been produced to defendants, Canada objected only to any potential prosecution of Mr. Gauthier—Bro–Tech's Canadian Sales Manager since 1996—but never raised any objection to the prosecution of any other defendant.

concerns in the criminal context, the Court holds that there are no due process issues raised here for the reasons discussed below.

Second, it is difficult to envision a situation where these blocking statutes could ever form the basis of a foreign sovereign compulsion defense, because they do not force anyone—let alone these defendants—to sell any product to Cuba or to travel to Cuba. Giving the blocking statutes the broadest reading possible, they prohibit certain persons from *not* trading with Cuba *only* if the decision not to trade with Cuba is because of the CACRs or instructions based on the CACRs. Corporations and persons in Canada, the United Kingdom, and the European Union can decide not to trade with Cuba for any other reason.

Third, in the two cases in which the doctrine has been applied, there was a specific order or action from a foreign government directed at the defendant. There is nothing like that here. In *Interamerican*, the Venezuelan government had issued specific orders to the defendant oil company to boycott the plaintiff company. After receiving those orders, the defendant company issued orders within the company and to its trading company, to comply. *See Interamerican*, 307 F.Supp. at 1294, 1296.

In *Societe Internationale*, foreign sovereign compulsion counseled against dismissal, where Societe Internationale Pour Participations Industrielles et Commerciales (SI), a Swiss corporation, failed to comply with an order under Rule 34 of the Federal Rules of Civil Procedure. The Rule 34 order required SI to make available for inspection and copying records relating to

a litigation. SI countered that it was prevented by Swiss penal law from turning over the documents. The Swiss Federal Attorney even confiscated the relevant records because, it maintained, disclosure of the records would be a violation of well-known Swiss banking secrecy law. *See Societe Internationale*, 357 U.S. at 199–200, 78 S.Ct. 1087.

A specific order or action satisfies the need for a real threat of prosecution under the foreign law. Before even considering the extreme remedy of dismissing an indictment, there must have been a threat of tangible sanction to the defendants if they complied with U.S. law.[7] Here, there was no such threat of sanction because there was no realistic possibility of prosecution under these laws.

The expert affidavits give no information about prosecutions under the laws, and when the Court asked defense counsel at oral argument whether there had been any, counsel did not know. It would be very difficult for the Canadian or U.K. government to mount a prosecution under the blocking statutes. Those governments would have to show that a company or individual did not do business with Cuba because of a desire to comply with the CACRs. It would be very difficult to get evidence of a company's intent in not doing something.

Realizing this, the defendants point to a reference in the indictment to a 1993 memorandum from Stefan Brodie, stating that "[n]o shipment of Purolite merchandise [wa]s to be shipped to, redirected to, or trans-shipped to Cuba." Indictment, Count 1, ¶ 16. This is apparently what the defendants rely on to fulfill the requirement

---

7. Even the most ardent proponents of the defense recognize that in order for the defense to be triggered, there must be a threat of tangible sanctions. *See* Don Wallace, Jr. & Joseph P. Griffin, *The Restatement and Foreign Sovereign Compulsion: A Plea for Due Process*, 23 Int'l Law 593, 598–99 (Oct.1999).

that there has to be some real threat to the defendant from the foreign law. But the indictment does not say who saw the letter, whether anyone acted on it, and so forth. The defendants seem to be arguing that they had to sell to Cuba after the date of the memorandum or else they would have been prosecuted on the basis of the memorandum. This possibility seems unlikely to the Court, even apart from the fact that these laws do not appear to apply to the defendants at all, as will now be discussed.

### a. *Canada*

Defendants challenge the prosecutions of James Sabzali, Bro–Tech Corporation, and Donald Brodie based on the operation of Canadian law. They thus move for dismissal of counts 2–36, 41, and 43–47. *See* Def. Compulsion Brf. at 24.

Defendants argue that, starting in 1992 and until Mr. Sabzali moved to the United States, the prohibition prong of the 1992 Canadian Order applied to him and compelled him to negotiate and arrange for sales with Cuba. But the 1992 Canadian Order applied only to corporations. It was not until 1996 that the order was amended to expand the application of this prohibition to "directors, officers, managers, and employees in positions of authority." 1996 Amended Canadian Order ¶ 5.

After April 1996, Mr. Sabzali lived and worked in the United States. His conduct while in the United States would not be covered by Canadian law.

The defendants also argue that Bro–Tech—despite incorporation in Delaware and headquarters in Pennsylvania—was compelled by the Canadian orders to violate United States law. The defendants' expert affidavit, however, speaks only about Purolite Canada, Bro–Tech's Canadian sales office. Purolite Canada is not named as a defendant, so opinions relating to it are irrelevant.

Even as to Purolite Canada, the affidavit is inadequate. If Purolite Canada were subject to the Canadian orders, there must still be a showing that the Canadian laws were "basic and fundamental" to the alleged behavior with which Bro–Tech has been charged, and that the corporation made a good faith attempt to comply with American law. Both are lacking.

Nothing indicates that defendants' trade with or travel to Cuba resulted basically and fundamentally from compliance with Canadian law. Indeed, the indictment suggests otherwise. Sales had begun in March 1992. *See* Indictment, Count 1 ¶ 16. Defendants do not allege that such trade was compelled by Canadian law, nor could they, since the Canadian blocking law could only have been activated by orders pursuant to the CACRs. It was not until April 1993 that the directive defendants argue triggered the Canadian blocking statute was allegedly sent. The indictment mentions no reaction or response to the memorandum on the part of anyone at Bro–Tech, and certainly not one involving consideration of foreign blocking laws. Thus, the Court would have to assume that after the sending of the alleged memorandum, Bro–Tech's motivation for trading with Cuba shifted from profit to fear of prosecution under Canadian law. This Court will not make such an assumption.

Defendants also argue that Canadian compulsion should excuse Donald Brodie's action. Because their arguments regarding Donald Brodie and Canadian law are valid only if Mr. Sabzali and Bro–Tech are compelled under the Canadian laws, and the Court has found no such compulsion, the Court holds that Donald Brodie is not saved from criminal exposure under U.S. law for his actions.

### b. *United Kingdom*

Defendants also argue that U.K. law compelled sales and shipments from Purolite International through intermediaries to Cuba. As a result, they move for dismissal of indictment counts 31–32, 43–45, 47–51, 53–60, 64–65, 69–70, 74–75, and 77, as against Donald Brodie, James Sabzali, and the Bro–Tech Corporation. *See* Def. Compulsion Brf. at 27–29.

Because the U.K. entity of Purolite International is not a defendant, arguments about its compulsion are irrelevant. Thus, only the arguments regarding Bro–Tech Corporation and Donald Brodie bear examination. A premise of the defendants' arguments is that the U.K. law applies to entities and actions outside of the United Kingdom.

Professor Greenwood's opinion points out that the PTIA and the 1992 U.K. Directions apply to any "person in the United Kingdom." Greenwood Affidavit ¶¶ 6, 15. He then explains that laws of the United Kingdom are presumed not to have extraterritorial application, although a statute's disclosure of a contrary intention can rebut that presumption. All of this supports the conclusion that the law has no extraterritorial application. He next speculates, however, that the laws relating to trading with Cuba should have extraterritorial effect. He does not attempt to explain the anomaly of his position: by his read, the U.K. law violates precisely the principle—extraterritorial overreaching—that it was enacted to prevent. *See* Greenwood Affidavit ¶ 11.

Nonetheless, in trying to support this argument that, by negative implication only, the law should apply extraterritorially, Professor Greenwood cites the exact

provision which bars liability under the British laws for Bro–Tech Corporation and the Brodies. *See id.* ¶ 12 (citing PTIA, section 3(2)). Specifically, that provision states:

> A person who is neither a citizen of the United Kingdom and Colonies, nor a body corporate incorporated in the United Kingdom shall not be guilty of any offense ... by reason of anything done or omitted outside the United Kingdom
> . . . .

PTIA § 3(2). Bro–Tech is not incorporated in the United Kingdom, and Donald and Stefan Brodie are not citizens of the United Kingdom or its colonies.

Professor Greenwood also speculates, despite his admission that the legislative history of the PTIA is silent on its scope and that there is no authority on the point, that it "appears to [him] to follow from the application of general principles" that the U.K. law would apply against Stefan Brodie *if* a letter were sent to a U.K. company from him and *if* that letter were directions for compliance with the CACRs (emphasis added).[8] He does not assert, based on these actions, that either Bro–Tech Corporation, James Sabzali or Donald Brodie would be subject to liability under the U.K. laws. *See* Greenwood Aff. ¶ 13, 28.

Without an allowance for extraterritorial application, about which Professor Greenwood only speculates, his opinion only states that Stefan Brodie's sending a letter might have constituted an offense under U.K. law, and that subsequent actions of Purolite International or Bro–Tech Ltd., in complying with the letter, would be offenses. Of these, only Stefan Brodie is a named defendant. Any prosecution of him based on his merely sending the 1993

8. For its purposes, the Court will assume Professor Greenwood is referring to the 1993 Memorandum.

Memorandum—which allegedly occurred over seven years ago—should presumably have commenced already.

### c. *European Union*

Defendants move that operation of the EC Regulation similarly counsels dismissal of counts 31–32, 43–45, 47–51, 53–60, 64–65, 67, 69–70, 74–75, and 77 as against Donald Brodie, James Sabzali, and Bro–Tech Corporation. *See* Def. Compulsion Brf. at 28–29. The EC Regulation was made effective in the United Kingdom through the adoption of the 1996 U.K. Order, which criminalized violations of the EC Regulation in the United Kingdom. *See* Greenwood Aff. ¶¶ 23, 26. But the 1996 U.K. Order did not change the jurisdictional reach of the law, and thus it remained true that only U.K. persons, or non-U.K. persons for acts committed in the United Kingdom, could be subject to prosecution for violations. Accordingly, this Court's analysis relating to the United Kingdom still applies.

Thus, for the reasons set forth above, the Court will deny the motion for dismissal on grounds of foreign sovereign compulsion.

### B. *Lack of Jurisdiction*

■ The defendants argue that counts 8, 9, 18, 30–32, 36, and 43–76 of the indictment must be dismissed because they allege conduct occurring entirely outside the United States, and, therefore, outside of this Court's jurisdiction. *See* Def. Compulsion Brf. at 31–32. The defendants contend that this result is mandated by reasonableness standards set forth in Section 403 of the *Restatement of Foreign Relations 3d.* The Court finds no merit to the defendants' arguments.

First, the counts for which defendants request dismissal on jurisdictional grounds do not involve wholly extraterritorial con-

duct. Defendants misconstrue two sets of counts as wholly extraterritorial. The first set comprises sixteen counts against James Sabzali alleging TWEA violations for accepting reimbursement from Bro–Tech for expenses relating to travel to Cuba. But these are not wholly extraterritorial; the indictment alleges that each set of his expenditures was approved and reimbursed from the United States.

The defendants also focus on a group of counts involving shipment from Purolite International in the United Kingdom. There are no U.K. persons charged in this indictment, however—only the U.S. persons that approved each transaction. Thus, relevant action took place in the United States.

■ Second, the Third Circuit has not applied Section 403 of the Restatement to a threshold jurisdictional analysis. Our Court of Appeals has applied a two-step test to determine whether a court has subject matter jurisdiction to hear a certain case involving wholly extraterritorial conduct. First, it determines whether Congress intended for the statute in question to apply extraterritorially. *See United States v. Martinez–Hidalgo*, 993 F.2d 1052, 1055 (3d Cir.1993); *United States v. Wright–Barker*, 784 F.2d 161, 167 (3d Cir. 1986). Defendants concede that TWEA and the CACRs were intended to have extraterritorial application. *See* Def. Compulsion Brf. at 16. Moreover, in *United States v. Plummer*, 221 F.3d 1298, 1310 (11th Cir.2000) (*citing United States v. Bowman*, 260 U.S. 94, 98, 43 S.Ct. 39, 67 L.Ed. 149 (1922)), the Eleventh Circuit found such Congressional intent based on both the language of TWEA and the nature of the harm that the statute aimed to prevent.

Next, having found intent for extraterritorial application, the court examines

whether the conduct in question had, or was intended to have, effects in the United States.[9] *See Martinez–Hidalgo*, 993 F.2d at 1055; *Wright–Barker*, 784 F.2d at 167. As the *Plummer* court said, a violation of TWEA and the CACRs, even extraterritorially, has domestic effects. Violations benefit an economy and a regime "that is deemed by the political branches of the government to threaten national interests." *Plummer*, 221 F.3d at 1309.

Accordingly, this Court has subject matter jurisdiction over the charges alleged in the indictment.

## C. *International Comity*

The defendants argue that, even if this Court has jurisdiction, it should not exercise it over counts 1, 31–32, 43–45, 47–51, 53–60, 64–65, 67, 69–70, 74–75, and 77 of the indictment in deference to principles of international comity. *See* Def. Comity Brf. at 1.

 In *Mannington Mills*, our Court of Appeals adopted a ten-factor balancing test to decide whether a court should take jurisdiction over extraterritorial conduct:

(1) degree of conflict with foreign law or policy;

(2) nationality of the parties;

(3) relative importance of the alleged violation of conduct here compared to that abroad;

(4) availability of remedy abroad and the pendency of litigation there;

(5) existence of intent to harm or affect American commerce and its foreseeability;

(6) possible effect upon foreign relations if the court exercises jurisdiction and grants relief;

(7) whether, if relief is granted, a party will be placed in the position of being forced to perform an act illegal in either country or be under conflicting requirements by both countries;

(8) whether the court can make its order effective;

(9) whether an order for relief would be acceptable in this country if made by the foreign nation under similar circumstances; and

(10) whether a treaty with the affected nations has addressed the issue. *See* 595 F.2d at 1297–1298 (citing *Timberlane Lumber Co. v. Bank of America*, 549 F.2d 597, 614–15 (9th Cir.1976)).

The defendants claim that in *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993), the Supreme Court set forth a new analysis for comity decisions. They argue that courts now need only determine whether: (1) the alleged relevant conduct occurred extraterritorially; and (2) whether the alleged actors were unable to comply with both domestic and foreign law. *See* Def. Comity Brf. at 14.

The Court disagrees with the defendants' reading of *Hartford Fire*.[10] The Supreme Court did not purport to replace the multi-factor analysis of *Mannington Mills* and other cases. Nor has our Court of Appeals adopted any such shortened test. *See Republic of Philippines v. Westinghouse Elec. Corp.*, 43 F.3d 65, 75 (3d Cir. 1994) (postdating *Hartford* but referencing multi-factor analysis). In *Hartford*, the Supreme Court addressed only one of the seven factors on which the Ninth Circuit had relied in holding that jurisdiction in

---

**9.** Where Congress has explicitly stated its intention to overrule international law, no effects test is required. *See United States v. Martinez–Hidalgo*, 993 F.2d at 1052, 1055.

**10.** Under the defendants' test, the result would be the same here.

the underlying case was appropriate. The Court noted that "[w]e have no need in this case to address other considerations that might inform a decision to refrain from the exercise of jurisdiction on the grounds of international comity." *Hartford Fire,* 509 U.S. at 799, 113 S.Ct. 2891.

■ The government makes the threshold argument that international comity can never be a reason to dismiss an indictment because the Executive has already done the balancing in deciding to bring the case in the first place. The government's argument has force. Factors 3, 4, 6, and 10 are especially within the responsibility of the Executive to evaluate. Other factors are less relevant here as well. Indeed, factor 5 is not relevant in the non-antitrust context. Factors 7, 8 and 9 do not fit easily within the criminal context because they relate to the impact of injunctions that ordinarily do not result from a criminal prosecution. The Court, nevertheless, will apply the ten-factor test of *Mannington Mills* to this case.

1. *Degree of Conflict.* Although the Canadian, United Kingdom, and European Union laws attempt to "block" compliance with the CACRs, they have little, if any, impact on these defendants or the conduct with which they are charged.

2. *Nationality of Parties.* Bro–Tech is an American corporation, incorporated in Delaware and headquartered in Pennsylvania. Both Donald and Stefan Brodie live and work in the United States. James Sabzali is a Canadian citizen who has been living and working in the United States since 1996.

3. *Relative Importance of Violation.* The fact that this is a criminal case indicates that it is of great importance to the United States.

4. *Availability of Remedy Abroad.* There is no remedy abroad; these countries disagree with the United States' position on trade with Cuba.

5. *Intent to Harm or Affect American Commerce.* This factor has little, if any, relevance to a non-antitrust case like this one.

6. *Possible Effect on Foreign Relations.* The Executive has already made the balance between harm to the United States from the defendants' conduct and any damage to the country's foreign relations.

7. *Conflicting Requirements.* This factor is less relevant in the criminal context because the case is concerned with penalties for past conduct and not necessarily a forward-looking injunction that may raise conflicting requirements.

8. *Effectiveness of Order.* This factor's relevance is questionable for the same reason that factor 7 is.

9. *Acceptability of a Similar Foreign Order.* Again, in a criminal case, such as this one, where past conduct is at issue, it is difficult to apply this factor.

10. *Treaties.* The parties have not brought to the Court's attention any treaties with Canada, the United Kingdom, or the European Union that limit the power of the United States to enforce TWEA or the CACRs.

The Court thus finds that the comity considerations do not counsel against hearing this case. I will therefore deny the motion to dismiss the indictment based on comity.